# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD LIVINGSTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 05-CV-11349-RCL |
| | ) |
| MBTA EMPLOYEES CREDIT UNION, | ) |
| | ) |
| Defendant. | ) |

## AFFIDAVIT OF PETER C. NETBURN IN SUPPORT OF DEFENDANT MBTA EMPLOYEES CREDIT UNION'S MOTION FOR SUMMARY JUDGMENT

I, Peter C. Netburn, am an attorney admitted to the bar of the Commonwealth of Massachusetts and the bar of the United States District Court of Massachusetts.  I represent Defendant MBTA Employees Credit Union (the "Credit Union") in the above-referenced matter. True and accurate copies of the following documents in support of the Credit Union's Motion for Summary Judgment are attached hereto:

1.    Certified copy of the Deed for the residential home and property located at 15 Quarry Lane, Milton, Massachusetts (the "Milton Property") dated August 29, 1985, recorded in the Norfolk Registry of Deeds at Book 6777, Page 504.

2.    Certified copy of Mortgage dated April 28, 1994 given by Richard Livingston and Margaret Livingston to MBTA Employees Credit Union, recorded in the Norfolk Registry of Deeds at Book 10500, Page 78 ("Credit Union Mortgage").

3.    Certified copies of the following:  (1) Judgment of Divorce Nisi entered on December 14, 1998, in <u>Margaret Livingston v. Richard Livingston</u>, Docket No. 97D1237

(Norfolk Probate and Family Court) ("Divorce Litigation"); (2) Separation Agreement dated December 14, 1998, which was incorporated into the Judgment of Divorce Nisi in the Divorce Litigation; (3) Judgment entered January 31, 2000 in the Divorce Litigation; (4) Order entered on August 24, 2000 in the Divorce Litigation; and (5) Judgment of Contempt entered on May 24, 2001 in the Divorce Litigation.

4.      Certified copy of docket in <u>In Re: Richard L. Livingston</u>, Case No. 01-11602-JNF (United States Bankruptcy Court – D. Mass.) ("Bankruptcy Litigation").

5.      Certified copy of Order entered on April 24, 2001 in the Bankruptcy Litigation.

6.      Certified copy of Mortgage dated July 27, 2001 from Margaret Clifford to Chittenden Trust Co. d/b/a Mortgage Service Center, recorded in the Norfolk Registry of Deeds at Book 15350, Page 263.

7.      Copy of an Appraisal of the Milton Property prepared by Falconer Appraisal Services, Inc. for Chittenden, which was produced by Livingston in the course of this litigation as Exhibit A to "DISCLOSURE Plaintiff's Response to Defendant's Request for Computation of Plaintiff's Damages" dated May 19, 2006.

8.      Copy of a Mortgage Payoff Inquiry for the Credit Union Mortgage dated July 26, 2001, which was produced by Livingston in the course of this litigation as Exhibit B-9-1 to "DISCOVERY Plaintiff's Response to Defendant's Request for Documents" dated May 9, 2006.

9.      Certified copy of Mortgage Discharge dated August 24, 2001 regarding the Credit Union Mortgage, recorded in the Norfolk Registry of Deeds at Book 18303, Page 69.

10.     Attested copy of docket in <u>Richard Livingston v. Margaret Livingston</u>, Docket No. 2001-J-0601 (Mass. App. Ct.).

11.     Certified copy of Order entered on November 6, 2001 in the Bankruptcy Litigation.

12.     Attested copy of docket in <u>Richard Livingston v. Margaret Livingston</u>, Docket No. 2002-J-0426 (Mass. App. Ct.).

13.     Attested copy of docket in <u>Richard Livingston v. Margaret Livingston</u>, Docket No. 2002-P-1164 (Mass. App. Ct.).

14.     Attested copy of docket in <u>Richard Livingston v. Margaret Livingston</u>, Docket No. DAR-12889 (Mass.).

15.     Copy of <u>Livingston v. Livingston</u>, 2003 WL 22928524 (Mass. App. Ct. Dec. 11, 2003).

16.     Certified copy of Complaint filed in <u>Richard Livingston v. Victoria Schepps</u>, Civil Action No. 0455CV53 (Stoughton District Court) ("Schepps Litigation").

17.     Certified copy of docket in Schepps Litigation.

18.     Certified copy of the Credit Union's By-Laws from the Massachusetts Office of Consumer Affairs and Business Regulation, Executive Office of Economic Development, Division of Banks.

19.     Certified copy of Complaint filed in <u>Richard Livingston v. Massachusetts Bay Transportation Authority Employees Credit Union, *et. al.*</u>, Docket No. 05-1289 (Suffolk Superior Court) ("Election Injunction Litigation").

20.     Certified copy of docket in Election Injunction Litigation.

21.     Certification regarding the status of the Credit Union from the Massachusetts Office of the Commissioner of Banks.

22.     Copy of portion of document entitled "Terms and Conditions of Electronic Funds Transfer" regarding the Credit Union, which was produced by Livingston in the course of this litigation as Exhibit B-2 to "DISCOVERY Plaintiff's Response to Defendant's Request for Documents" dated May 9, 2006.

23.     Certified copy of Title Standard No. 21 of the Real Estate Bar Association of Massachusetts.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14th DAY OF JULY, 2006.

/s/ Peter C. Netburn
PETER C. NETBURN

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 14, 2006.

/s/ Eric C. Hipp
Eric C. Hipp

G:\DOCS\ECH\Clients\CUMIS\MBTA ECU - Livingston\Pleadings\MSJ\Affidavit of Peter Neturn.doc

# EXHIBIT 1

6777

504

We, Martin J. White and Elaine I. Boyle

of  Milton, Norfolk                                    County, Massachusetts,

*being unmarried*, for consideration paid $ 142,900.00

grant to  Richard Livingston and Margaret Livingston, Husband and Wife,
          as Tenants by the Entirety

of    15 Quarry Lane, Milton, MA                      with quitclaim covenants

~~the land in~~ x

X~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ X

A certain parcel of land with the buildings thereon situated on the
southwesterly side of Quarry Lane in Milton, Massachusetts, being
shown as Lot B on a plan entitled "Plan of Lot Subdivision on Pleasant
Street and Quarry Lane, Milton, Massachusetts, Scale:  1" = 20'," by
John H. Bowie, Civil Engineer, dated February 14, 1933, recorded with
Norfolk Registry of Deeds as Plan No. 156 of 1933 in Book 1987, Page
End, bounded and described, according to said plan, as follows:

NORTHEASTERLY  by Quarry Lane, sixty (60) feet;

SOUTHEASTERLY  by land of James Cullen, et al, one hundred and 49/100
               (100.49) feet;

SOUTHWESTERLY  by Lot A, sixty-two and 60/100 (62.60) feet; and

NORTHWESTERLY  by Lot C, ninety-two and 18/100 (92.18) feet.

Containing 5,595 square feet, according to said plan.

For title reference, see Deed from Thomas L. Richards and Edith
Richards, to us, dated July 23, 1984, recorded on September 6, 1984,
with the Norfolk Registry of Deeds, Book 6491, Page 137.

CANCELLED

AUG 24 1985

COMMONWEALTH OF MASSACHUSETTS
DEEDS EXCISE

9 2 6. 0 4

**PROPERTY ADDRESS:  15 Quarry Lane, Milton, MA**

**RECEIVED RECORDED 1985 AUG 30  PM 12: 01**

~~Witness~~ our hand s and seal s this 29th day of August 19 85

.............................................      *Martin J. White*
.............................................      Martin J. White
.............................................      *Elaine I. Boyle*
                                                   Elaine I. Boyle

**The Commonwealth of Massachusetts**

SUFFOLK,                ss.                August 29,            1985

Then personally appeared the above named  Martin J. White and Elaine I. Boyle

and acknowledged the foregoing instrument to be  their free act and deed, before me,

A true ...... lib. 6777 Fol. 504    *Donald G. Paige*
in No. ...... Registry of Deeds    Donald G. Paige, Notary Public ~~Justice of the Peace~~
Dedham, Mass.
Certify ...... *P. O'Donnell*      My Commission expires  January 24      19 86

Register



# EXHIBIT 2

3 . .          58076      BK 10500PG078                                    ℐᵏ

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on **April 28**
**1994** . The mortgagor is    **Richard Livingston and Margaret Livingston.**
                          ("Borrower"). This Security Instrument is given to    **MBTA Employees**
**Credit Union**                                              , which is organized and existing
under the laws of **Massachusetts**          , and whose address is     **500 Arborway, Jamaica**
**Plain, Massachusetts 02130.**                                            ("Lender").
Borrower owes Lender the principal sum of     **One Hundred Sixteen Thousand, Two Hundred**
**Fifty and 00/100 Dollars** S. $ **116,250.00**          ). This debt is evidenced by Borrower's note
dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not
paid earlier, due and payable on **June 1, 2024**              . This Security Instrument
secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and
modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security
of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument
and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following
described property located in Norfolk                                    County, Massachusetts:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which has the address of **15 Quarry Lane, ,**                             **Milton** ,
                          [Street]                                          [City]
**Massachusetts**        **02186**                    ("Property Address");
                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances,
and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security
Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage,
grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants
and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited
variations by jurisdiction to constitute a uniform security instrument covering real property.

**MASSACHUSETTS**–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3022 9/90 (page 1 of 6 pages)



BK 10500 PG079

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

Form 3022 9/90 (page 2 of 6 pages)

BK10500PG080

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

## BK10500PG081

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural

Form 3022   9/90   (page 4 of 6 pages)

BK 10500PG0082

person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior written notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by applicable law, in the manner provided by applicable law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of



Form 3022  9/90  (page 5 of 6 pages)

BK 10500PG083

of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.
21.   Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.
23.   Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.
24.   Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☒ Adjustable Rate Rider      ☐ Condominium Rider           ☐ 1-4 Family Rider
☐ Graduated Payment Rider    ☐ Planned Unit Development Rider  ☐ Biweekly Payment Rider
☐ Balloon Rider              ☐ Rate Improvement Rider      ☐ Second Home Rider
☐ Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

....................................................... (Seal)
Richard Livingston                        —Borrower
Social Security Number .... 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 ...........

....................................................... (Seal)
Margaret Livingston                       —Borrower
Social Security Number .... 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 ...........

....................................................... (Seal)
                                          —Borrower
Social Security Number ...............................

....................................................... (Seal)
                                          —Borrower
Social Security Number ...............................

———————————— [Space Below This Line For Acknowledgment] ————————————

Commonwealth of Massachusetts,        Suffolk, ss:

On this 28th day of April, 1994 , before me personally appeared Richard Livingston and Margaret Livingston
and acknowledged the foregoing to be his/her/their free act and deed.

My Commission Expires: July 14, 2000

....................................................... (Seal)
Amy Berlin Cook                           —Notary Public

Form 3022   9/90   (page 6 of 6 pages)

BK10500PG084

## EXHIBIT A

A certain parcel of land with the buildings thereon situated on the southwesterly side of Quarry Lane in Milton, Massachusetts, being shown as Lot B on a plan entitled "Plan of Lot Subdivision on Pleasant Street and Quarry Lane, Milton, Massachusetts, Scale: 1" = 20'," by John H. Bowie, Civil Engineer, dated February 14, 1933, recorded with Norfolk Registry of Deeds as Plan No. 156 of 1933 in Book 1987, Page End, bounded and described, according to said plan, as follows:

NORTHEASTERLY: by Quarry Lane, sixty (60) feet;

SOUTHEASTERLY: by land of James Cullen, et al, one hundred and 49/100 (100.49) feet;

SOUTHWESTERLY: by Lot A, sixty-two and 60/100 (62.60) feet; and

NORTHWESTERLY: by Lot C, ninety-two and 18/100 (92.18) feet.

Containing 5,595 square feet, according to said plan.

For title see deed of Martin J. White and Elaine I. Boyle to Richard Livingston and Margaret Livingston dated August 29, 1985, and recorded with said Registry Book 6777, Page 504.



# ADJUSTABLE RATE RIDER  BK10500PG085
(1 Year Treasury Index – Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 28th day of April, 1994 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to MBTA Employees Credit Union

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

15 Quarry Lane, Milton, Massachusetts 02186.
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

ADDITIONAL COVENANTS  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 4.500% . The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates
The interest rate I will pay may change on the First day of June , 1995 and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date".

(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index  The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as made available by the Federal Reserve Board.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and three-quarters percentage points (2.750% ) to the Current index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125% ). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 6.500% or less than 2.750% . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.000%) from the rate of interest I have been paying for the preceding twelve months. My interest rate will never be greater than 10.500% .

(E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 17 of the Security Instrument is amended to read as follows.
Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

MULTISTATE ADJUSTABLE RATE RIDER-ARM 5-2- Single Family - Fannie Mae/Freddie Mac Uniform Instrument          Form 3111 3/85

BK 10500PG086

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

......................................................................(Seal)
Richard Livingston                                        —Borrower

......................................................................(Seal)
Margaret Livingston                                       —Borrower

......................................................................(Seal)
                                                          —Borrower

......................................................................(Seal)
                                                          —Borrower

Commonwealth of Massachusetts,         Suffolk, ss:

On this 28th day of April, 1994, before me personally appeared Richard Livingston and Margaret Livingston and acknowledged the foregoing to be his/her/their free act and deed.

......................................................................(Seal)
Amy Berlin Cook                                           —Notary Public

My Commission Expires: July 14, 2000

A true copy from Lib. 10500 Fol. 78
in Norfolk County Registry of Deeds
Dedham, MA
Certify: _____ P O'Donnell
                                              Register

# EXHIBIT 3

.

# THE COMMONWEALTH OF MASSACHUSETTS
# THE TRIAL COURT

## PROBATE AND FAMILY COURT

### NORFOLK DIVISION

**I, Patrick W. McDermott,** Register of the Probate and Family Court for said County of Norfolk, having, by law, custody of the seal and all the records, books, documents and papers of or appertaining to said Court, hereby certify the paper hereunto annexed to be a true copy of a paper appertaining to said court, and on file and of record in the office of said Court, to wit:

IN THE MATTER OF LIVINGSTON V. LIVINGSTON

JUDGMENT ENTERED MAY 24, 2001;ORDER ENTERED AUGUST 24, 2000; ORDER ENTERED AUGUST 24, 2000; JUDGMENT ENTERED JANUARY 31, 2000; JUDGMENT ENTERED AND AGREEMENT DATED DECEMBER 14, 1998.

RE: 97D1237D1

IN WITNESS WHEREOF,
I have hereunto set my hand and
affixed the seal of said Court,
this 6TH day of JULY
In the year of our Lord two thousand and six



_____
*Register*

Commonwealth of Massachusetts
The Trial Court
Probate and Family Court Department

NORFOLK DIVISION                    DOCKET NO: 97D1237-D1

Margaret Clifford, Plaintiff

vs.

Richard Livingston, Defendant

JUDGMENT OF CONTEMPT
(Complaint filed January 24, 2000)

After hearing, it is Adjudged that:

1.      The Court finds that as a result of the former husband's filing for bankruptcy, it is extremely unlikely that any lender will furnish the funds necessary for the parties to refinance the first and second mortgages and to pay marital debt.

2.      The Court further finds that had the refinance taken place pursuant to a prior order of this Court, the former wife would have been relieved from paying the second mortgage in the amount of $180 per month ($42 per week).

3.      The Court finds that pursuant to the separation agreement of the parties, the former husband agreed to pay the first mortgage in the amount of $1,300 per month ($300 per week) in lieu of child support.

4.      Due to the complications created by the former husband's filing for bankruptcy, from which relief was given by the Bankruptcy Court from the automatic stay, the former husband's child support obligation shall be specifically articulated to avoid further confusion and multiple court appearances, which have occurred to date.

5.      Accordingly, commencing Friday, May 25, 2001, and on each and every Friday thereafter, the former husband shall pay the sum of $342 per week for support of the two unemancipated children. (This sum is equivalent to the payment of the first and second mortgages with respect to the former marital home in which the former wife and the two unemancipated children reside.)

6.      The aforesaid child support payments shall be made payable to the Commonwealth of Massachusetts and shall be sent to Department of Revenue,

Box 9140, Boston, MA 02205-9140, by means of an implemented wage assignment.

7.   If for any reason the wage assignment is not implemented, it shall be defendant's responsibility to pay the aforesaid child support directly to the Department of Revenue each and every Friday without excuse and without delay.

8.   Counsel fees in the amount of $3,500 are hereby awarded to the plaintiff pursuant to the provisions of G.L. chap. 208, sec. 38.

9.   The aforesaid counsel fees shall be deducted from the former husband's share of the net proceeds arising from the sale of the former marital home.

10.   The former wife shall have the right to refinance the first and second mortgages with respect to the former marital home in order to satisfy the existing first and second mortgages and to pay outstanding marital debt if she so elects.

11.   The former husband shall not be required to sign any documents in connection with the wife's effort to refinance the outstanding mortgages and existing marital debt.

12.   The former wife shall also have the right, at her sole option, to file for bankruptcy in order to eliminate the marital debt as the former husband is seeking to do.

___May 24, 2001___
Date

_____
Justice

Commonwealth of Massachusetts
The Trial Court
Probate and Family Court Department

NORFOLK DIVISION                              DOCKET NO: 97D1237-D1

Margaret Livingston, Plaintiff

vs.

Richard Livingston, Defendant

ORDER
(Complaint for contempt filed January 24, 2000)

This matter came on for hearing before the Court, KOPELMAN, J. presiding, and after hearing,

It is Adjudged that:

1.      James McLaughlin, Esq. is hereby appointed special master and is authorized to
        take whatever steps are necessary in behalf of the defendant to implement all of
        his obligations which are set forth on pages nine and eleven of a separation
        agreement dated December 14, 1998.

2.      It shall be the defendant's obligation to pay the fees and costs of the special
        master, which the Court assumes will be inversely proportional to the extent of his
        cooperation with the special master.

___August 24, 2000___                          _____
        Date                                              Justice

# Commonwealth of Massachusetts

### The Trial Court
<u>NORFOLK</u> **Division**    **Probate and Family Court Department**    **Docket No.** <u>97D1237-D1</u>

## Order — Judgment on Complaint for Contempt

**filed on** <u>January 24, 2000</u>

<u>Margaret Livingston</u>, **Plaintiff**

**v.**

<u>Richard Livingston</u>, **Defendant**

I.    After hearing, it is adjudged that the defendant is guilty of contempt of this court for having willfully:

A.    [X]    neglected and refused to pay child support/alimony, the arrearage of which is fixed at <u>$1,853.75 to the plaintiff and $950 to Attorney Eunmi Lee, Esq., as counsel fees</u>

B.    [ ]    neglected and refused to pay medical bills of the plaintiff/children in the amount of _____.

C.    [ ]    neglected and refused to allow the plaintiff visitation with the minor child(ren)

_____

_____.

D.    [ ]    neglected and refused to report to the Family Service Office regarding his/her job seeking efforts.

E.    [ ]    neglected and refused to pay the attorney fees owed to plaintiff's attorney in the amount of _____.

F.    [ ]    _____

_____

_____

_____

_____

_____.

**(OVER)**

II.    **It is ordered that:**

A. ☐    the defendant pay_____ toward the arrearage of_____.

B. ☐    the defendant pay_____ weekly/monthly
( _____ of which shall be applied against the arrearage).

C. ☐    the parties shall comply with the stipulation dated_____
which is incorporated and merged into this order/judgment.

D. ☐    the defendant shall report in person to the Family Service Office of this Court
each and every Friday with evidence of having sought employment from at
least _____ employers. The defendant shall provide the Family
Service Office with the name, address, and telephone number of the
employers and a copy of his/her job application or other proof of having
actually applied for work. VIOLATION OF THIS PARAGRAPH SHALL BE
DEEMED A CIVIL/CRIMINAL CONTEMPT OF COURT AND MAY SUBJECT
THE DEFENDANT TO A JAIL SENTENCE OF UP TO SIX MONTHS.

E. ☐    the defendant shall pay attorney fees in the amount of_____
and the cost of service of process which was necessary on this complaint,
to wit,_____.

F. ☒    defendant be committed to jail for 90 days unless sooner released by
payment of $2803.75 made payable to: $1853.75 to the plaintiff; $950.00 to Attorney Lee
If defendant purges by payment of said amount and is released from jail, defendant is ORDERED
to resume and stay current on his required support payments; and this contempt matter is
continued generally to ensure compliance. If defendant does not purge and serves his full
sentence, he shall be brought back before the court at the conclusion of his sentence.

III.    **It is further ordered that:**

A. ☐    the defendant be committed to jail for _____days until he/she
shall purge him/herself of said contempt by payment of _____
OR until further order of the Court OR until he/she be otherwise discharged
by due course of law and that a mittimus issue accordingly.

B. ☐    this sentence be suspended until_____.

C. ☐    this matter will be reviewed in court on November 22, 2000_____.

IV. ☐    After hearing, it is adjudged that defendant is not guilty of contempt of this
court.

Date August 24, 2000_____    _____
Justice of the Probate and Family Court

# COMMONWEALTH OF MASSACHUSETTS
## THE TRIAL COURT
### PROBATE AND FAMILY COURT DEPARTMENT

**NORFOLK, SS.**                               **DOCKET NO. 97D1237**


**MARGARET LIVINGSTON**
    Plaintiff

**v.**

**RICHARD LIVINGSTON**
    Defendant

## JUDGMENT
### (on Plaintiff's Cross Complaint for Contempt filed January 24, 2000)

After hearing, I find that defendant has failed to cooperate in obtaining refinancing on the former marital home as required in Exhibit A, paragraph (E)(5) of the Separation Agreement dated December 14, 1998. He has on two occasions failed to appear at scheduled closings, first in June, 1999 and then again in December, 1999. Although he claims he knew nothing about the closings, I do not find his statements credible. In fact, it is to his advantage to delay the refinancing for as long as possible since a refinance will result in increasing his monthly payments as he only now pays the first mortgage on the home. The refinance is intended to consolidate the first and second mortgages, the outstanding credit card debt and the Bank of Boston loan. Delay in the refinancing has been a financial detriment to plaintiff as she has had to continue paying the second mortgage ($180 per month).

With regard to the defendant's failure to pay uninsured medical bills, I find that he owes $1,308.75 to plaintiff for his one-half share of the bills.

With regard to the oil burner repair, I find that defendant owes $395 for that repair as his one-half of the balance due after application of the insurance.

Wherefore, it is ordered that:

1) Plaintiff is authorized to take all necessary steps to refinance the property. She shall keep defendant informed of where she is making applications and he shall join in the said applications. Plaintiff shall make all reasonable efforts to obtain the lowest interest rate available. If defendant fails to sign any applications, plaintiff may file a complaint for contempt and seek the appointment of a commissioner to sign on behalf of defendant, at defendant's expense.

2) Plaintiff shall inform defendant of the closing date for the refinancing in writing as

soon as she learns of the date. She shall also request that the closing attorney notify defendant by letter and telephone. The date for the closing shall be arranged so that if defendant fails to appear, there will be sufficient time to reschedule the closing so that plaintiff may come to court on a complaint for contempt and seek the appointment of a commissioner to execute all documents on behalf of defendant, at defendant's expense.

3) In view of plaintiff having to pay an additional $180 per month for the second mortgage since the first closing date in June, 1999, she shall be entitled to a credit at the time the house is sold and the proceeds divided. The amount of the credit shall be determined by multiplying $180 per month by the number of months after June, 1999, until the refinancing takes place and deducting that total from defendant's share of the proceeds.

4) Defendant shall pay $1,308.785 to plaintiff for the unpaid uninsured medical bills in three equal monthly installments of $436.25 to be made on February 15, 2000, March 15, 2000, and April 15, 2000.

5) Defendant shall pay his one-half share of the oil burner repair in the amount of $395 to plaintiff by February 25, 2000.

6) Although plaintiff is entitled to attorneys' fees in connection with her cross complaint for contempt, her issues were heard at the same time as defendant's complaint for contempt and attorneys' fees were granted in relation to that contempt which encompassed the same amount of time in court. However, she is not precluded from seeking attorneys' fees in the future if she brings a complaint for contempt for defendant's failure to comply with the terms of this Judgment of the Judgment entered on his complaint for contempt.

January 31, 2000                                  _Elsa M. Shaevel_
                                                       JUSTICE



**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court**

DOCKETED

DEC 1 6 1998

Norfolk Division                                          Docket No. 97Dl237-Dl


Margaret Livingston,  **Plaintiff**


v.          **JUDGMENT OF DIVORCE NISI**


Richard Livingston,  **Defendant**


        All persons interested having been notified in accordance with the law, and after hearing
and, it is adjudged nisi that a divorce from the bond of matrimony be granted the said plaintiff for
the cause of  as provided by Chapter 208, section l-B; and that upon and after the expiration of
ninety days from the entry of this judgment, it shall become and be absolute unless, upon the
application of any person within such period, the Court shall otherwise order.  It is further
ordered that the Agreement of the parties dated December l4, l998 is approved and incorporated
into and made part of this Judgment, but shall SURVIVE and be deemed to have independent
legal significance, except as to those provisions relating to the unemancipated children which
shall be incorporated and MERGED into this Judgment.

1.      SALE OF HOME: Wife's remarriage shall <u>not</u> trigger a required sale of the marital home.

2.      PERSONAL PROPERTY: Husband shall be entitled to the contested personal property
        listed at paragraph 2) of Exhibit I.

3.      BANK OF BOSTON LOAN (approximately $l2,000): Husband shall not be responsible
        for re-payment of this loan.

4.      $500 LEGAL FEE: Husband shall not be responsible for Wife's $500 legal fee on
        account of Quincy District Court criminal complaint.

5.      MAIDEN NAME: The wife is hereby given the right to resume her former name, to wit:
        Margaret M. Clifford.


__December 14, 1998__
Date
3/15/99

Christina L. Harms, Justice

NORFOLK
filed 12·14·98

Livingston  v.  Livingston                    97D1237-DV

## SEPARATION AGREEMENT

DOCKETED
SEP 16 1998

(17)

AGREEMENT made on this  14th day of December 1998 between Richard Livingston  of Milton, Norfolk County, Massachusetts (hereinafter referred to as the "Husband") and Margaret Livingston of Milton, Norfolk County, Massachusetts (hereinafter referred to as the "Wife").

### STATEMENT OF FACTS

The Husband and Wife were married on May 27, 1979  at Boston, Massachusetts  and last lived together at 15 Quarry Lane, Milton, Massachusetts. There are two  minor children, namely: Siobhan M. born , May 29, 1981, and Brendan R.  born June 29, 1987 .

The Husband and Wife have been separated since August 27, 1997 and are living apart. The Wife filed a Complaint for divorce in the Norfolk Probate Court. The Husbnd and Wife have had independent legal advice from counsel of their selection.  The Husband and Wife each fully understand the facts and have been fully informed of their legal rights and liabilities; and each signs the Agreement freely and voluntarily.

NOW, THEREFORE, in consideration of the mutual promises, agreements and covenants hereinafter contained, the Husband and Wife mutually agree as follows:

-1-



1.     From the date hereof, the Husband and Wife shall continue to live separate and apart for the rest of their lives as fully as if sole and unmarried, and free from the authority of, or interference by the other. This language shall not be construed as a restraining order pursuant to M.G.L. c. 209A.

2.     Except as provided herein, the Husband and Wife each hereby waives any right to elect to take against any last will made by the other, including all rights of dower or courtesy, and hereby waives, renounces and relinquishes unto the other, their respective heirs, executors, administrators and resigns forever, all and every interest of any kind or character which either have may now have or may hereafter acquire in or to any real or personal  property of the other, and whether now owned or hereafter acquired by either, except to enforce any obligation imposed by this Agreement. This Agreement shall be binding upon the estates of the parties.

3.     Except as otherwise herein provided, the Husband and Wife hereby mutually release and forever discharge each other from any and all actions, suits, claims, debts, demands and obligations whatsoever, which either of them has ever had, now has, or may hereafter have against each other, upon  or by any reason of any matter, cause or thing up to the date of this Agreement, including but not limited to, claims against each other's property, it being the intention of the parties that henceforth there shall exist as between them only such rights and obligations are specifically provided for in this Agreement.



-2-

4.    Except as herein provided, the Husband and Wife each warrant, represent and agree that he or she will not hereafter contract or incur any debt, charge or liability whatsoever in the other's name or for which the other, his or her legal representatives or his or her  property or estate will or may become liable; and, except as herein provided, the Husband and Wife further covenant at all times to hold the other free, harmless and indemnified from and against all
such debts, charges or liabilities hereinafter contracted or incurred by him or her in breach of the provisions of this paragraph, and from any and all attorneys' fees, costs and expenses incurred by the Husband or the Wife as a result of any such breach.

5.    The Husband and Wife agree that, in executing this Agreement, there have not been made, and they have not relied upon, any promises, warranties, or representations except as expressly contained herein.

6.    There are annexed hereto and hereby made a part hereof, Exhibit A- I . The Husband and Wife agrees to be bound by, and to perform and carry out all the terms of the said Exhibits to the same extent as if each of the said Exhibits was fully set forth in the text of this Agreement.

7.    Both the Husband and the Wife acknowledge and confirm that they willingly accept the provisions of this Agreement and deem it to be a fair and reasonable resolution of all issues and disputes with full consideration of the circumstances of each party and all factors required to be considered pursuant to M.G.L. c. 208, §34. Furthermore, each party acknowledges and confirms that no part of this Agreement is a product of fraud, duress or coercion and that each has freely had the opportunity to negotiate the terms of this Agreement to their respective satisfactions.

-3-

8.    The Husband and Wife represent, warrant and acknowledge that each has fully and completely described, disclosed and valued his or her income, assets, and liabilities to the other party to the best of their knowledge and ability. Financial statements have been prepared and exchanged pursuant to Probate Rule 401. The Husband and Wife each warrant that neither one of them is holding any undisclosed assets. Each party has carefully considered the

current assets and income, financial resources, liabilities and expenses of the other and of themselves.

9.    A duplicate original of this Agreement may be submitted to the Court and be incorporated in the judgment of divorce. Notwithstanding said incorporation, the Agreement shall not be merged into the judgment of divorce, but shall survive the same and be thereafter forever binding upon the Husband and Wife except for issues relating to the children which are merged with the judgment of divorce and over which the Court retains the power of modification.

10.    If either the Husband or Wife shall commit a breach of any of the provisions of this Agreement, and legal action shall be reasonably required to enforce such provisions and be instituted (by assertion of a claim, counterclaim or affirmative defense) by the other, the party in breach, as may be determined by a court of competent jurisdiction, shall be liable for all court costs and reasonable counsel fees incurred by the other party in instituting and prosecuting such action, or part thereof for which the breach was found. Breach shall include, but not be limited to, attempts to modify this Agreement contrary to its terms.

-4-

11.    The failure of the Husband or of the Wife to insist in any instance upon the strict performance of any of the terms hereof shall not be construed at a waiver of such term or terms for the future, and such terms shall nevertheless continue in full force and effect.

12.    In the event any part of this Agreement shall be held invalid, such invalidity shall not invalidate the whole Agreement but the remaining provisions of this Agreement shall continue to reflect fairly the intent and  understanding of the parties in executing this Agreement.

13.    The Husband and the Wife agree to execute any and all documents requested of each other which are executory of this Agreement. Failure to do so will constitute a breach thereunder.

14.    This Agreement shall be construed and governed according to the laws of the Commonwealth of Massachusetts.

15.    This Agreement shall not be altered or modified except by an instrument signed and acknowledged by the Husband and Wife or as provided by law.

Richard Livingston

Margaret Livingston

-5-

COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss.                                        December 14, 1998

Then personally appeared the above-named Richard Livingston and acknowledged the foregoing instrument to be her free act and deed before me.

Notary Public  *Danielle E. A. Beddick*
My Commission Expires: 11-29-2000

COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss.                                        December 14,1998

Then personally appeared the above-named Margaret Livingston and acknowledged the foregoing instrument to be her free act and deed before me.

Notary Public, *ELLIOT M. SHERMAN*
My Commission Expires:  4/8/99

EXHIBIT A

EQUITABLE DISTRIBUTION OF MARITAL ASSETS IN

ACCORDANCE WITH M.G.L. CHAPTER 208, § 34


A. MARITAL HOME

1. The Husband and the Wife own as tenants by the entirety the real estate located at 15 Quarry Lane, Milton, Massachusetts, consisting of a single family house. The Wife shall continue to have sole use and occupancy of the martial home which shall remain the primary home of the Wife and children.

2. The parties agree that the marital home will be put on the market at a price to be arrived at by the average of three prices suggested by real estate brokers selected by the parties and sold at the soonest to occur of the following events:

> 1. The emancipation of the youngest child as herein defined.
>
> 2. The death of the Wife.
>
> 3. The remarriage of the Wife.
>
> 4. The Wife's desire to sell the marital home.

At the time of the sale of the marital home, the Husband shall be or leased to Wife credited for any principal amounts he or she has paid into the mortgage first & second from the date of the and the parties will split equally the remaining net proceeds. Agreement until the property is sold

3. The Husband agrees to the Wife having the right to purchase the Husband's share of the marital home at any time at or prior to any of the events referenced in paragraph two above occurring at the property's fair market value less mortgages, to be determined by the average of three appraisals, one selected by each party and the third selected by the two selected by the parties.

If in the event of a refinance, the balance cates refinance and payment thereto and any subsequent refinance pursuant to paragraph 8 of this Exhibit.

-7-

4. Upon the occurrence of any of the events requiring the home to placed upon the market referenced in paragraph two above, and the Wife not wishing to purchase the Husband's share, the Husband shall have the right to purchase the Wife's share at the property's fair market value to be determined by the average of three appraisals, one selected by each party and the third selected by the two selected by the parties. Upon the first to occur of the events set forth in paragraph 2, the Wife will have ~~fifteen~~ 30 days to notify the Husband as to her intentions to purchase his share. If the Wife elects not to purchase the Husband's share, the Husband will have ~~fifteen~~ 30 days to notify the Wife as to his intentions to purchase her share, failing which, the House will be place upon the open market for sale to a third party in accordance with the terms of this Exhibit.

5. Subject to the debt provisions of subparagraph 2 of this Exhibit, the Husband will be responsible for the timely payment of the principal and interest on the first mortgage on the marital home, the real estate taxes and the homeowner's insurance.

6. ~~In the~~ At the time of the sale, the parties will agree upon a listing broker and the terms of the sale, failing which they will resort to the court for resolution of those issues.

7. Other than the costs set forth in subparagraph six above the wife will be responsible for all other payments relating to the marital home except for capital improvements and major repairs regarding which the parties will consult each other and agree upon a contractor and a price for which they will each be responsible for 50%. Neither party shall unreasonably withhold his agreement to such improvements and repairs.



-8-

B. RETIREMENT VEHICLES

    1. The parties have the following retirement Vehicles:

      Husband: MBTA Retirement Fund

               MBTA Deferred Compensation Plan- Copeland Companies

       Wife: Massachusetts Teacher's Retirement

               Security First 403(b) Tax Deferred Annuity Plan

    The parties agree to equalize their interests in these retirement plans by Qualified Domestic Relations Order.("QDRO")

    2. The Court will retain jurisdiction over this matter to enter appropriate QDRO's in forms acceptable to the plan administrators.



C. MOTOR VEHICLES

1. The Husband will transfer to the Wife his interest in the Subaru Station wagon ~~which was the marital vehicle~~.

2. The Wife waives any interest she may have in any vehicle currently owned by the Husband.

D. PERSONAL PROPERTY

1. The Husband and the Wife ~~will attempt to finalize the division of~~ *have divided* their ~~tangible~~ personal property ~~form lists drafted by each, any items not agreed upon will be submitted to the Court or a mediator for decision~~. *except for the items referred to in Exhibit I which will be decided by the judge and the following items which the wife will transfer to the husband within ten days of the execution of this agreement:*

(1) The antique kitchen table in the cellar
(2) The husband's clothes which remain in the house
(3) One glass front book case
(4) Desk in the cellar ✗
(5) Husband's tools ✗

PINATA 2. The husband agrees to give the wife the ~~PINATA~~ in his possession simultaneous with the transfer of the items listed in paragraph one to him.

3. In all other respects, neither party will make a claim for the division of personal property hereafter and the property in the custody or possession of a party shall belong to that party.

✗ (6) Husband's ski ~~boots~~
(7) Metal clothes cabinet
(8) ½ the Christmas decorations
(9) ½ the pots and pans
(10) ½ the Tupperware
(11) the 4 water colors in the living room
(12) Mrs. King's ~~Beveled~~ Chandelier into the attic
(13) The Dome Light in the attic

(14) 1 piece of Wedgewood
(15) 1 hummel

E. DEBT

1. The parties will continue to be ~~jointly~~ responsible for ~~the~~ joint [the payment of ½ each of the] credit card debt which is comprised of the [First of] America, First USA, ~~and~~ [Bravo,] Household Credit ~~accounts.~~ and Greenwood Trust (Discover) accounts. 

2. The parties will remain individually responsible for the credit card debt they have incurred individually.

3. The Wife will be responsible for her student loans ~~and the Bank of Boston loan which she took out with her mother~~.

4. Each of the parties will be responsible for whatever amounts they owe Dr. Solomon Levin [and Belle Soldway] per the temporary order of this Court.

5. At the Wife's election, the Husband agrees to cooperate with her in refinancing the marital home to consolidate the first and second mortgages, the outstanding credit card debt and the Bank of Boston loan. ~~Providing~~ [After said] refinancing, the Husband will pay the principal and interest ~~that the payment of any refinanced debt does not exceed $310.00 per~~ reflective of the first mortgage balance which is presently approx. ~~week, the Husband will be responsible for making this payment which is~~ $116,000 and the principal + interest reflective of one-half of the ~~reflective of principal and interest.~~ He will also be responsible for the taxes, [insurance] credit card debt (presently approx. $12,000) and ~~the~~ one half of the ~~and homeowners insurance. Other than these costs, the Wife will be~~ second mortgage (presently approx. $7,000). ~~The wife will be responsible~~ ~~responsible for all other payments relating to the marital home except for~~ ~~the payment~~ The Wife will be responsible for the ~~other half of the~~ ~~capital improvements and major repairs. With respect to capital~~ payment reflective of the other half of the credit card debt ~~improvements and major repairs, the parties will consult each other and~~ (presently approx $12,000) and the other half of the second ~~agree upon a contractor and a price for which they will be equally~~ mortgage (presently approx $7,000). ~~responsible.~~

~~6. If the amount of the payment on the refinanced debt is in excess~~ ~~of $310 per week, the Wife will have the option of being responsible for~~ ~~any overage or of electing not to refinance.~~

6. Each will hold the other harmless and indemnify the other for the payment of one half of this debt.

-11-

6. Both parties shall promptly cooperate and submit all needed loan applications and documents needed to pursue or obtain such refinancing and the Husband agrees to submit said application to the MBTA Employees Credit Union.



EXHIBIT B

ALIMONY

The Husband and the Wife each waive any rights each may have to receive alimony from the other now and in the future.



EXHIBIT C

CHILD CUSTODY, VISITATION AND SUPPORT

*See stipulation of the parties attached hereto.*

~~A.~~ ~~The Husband and the Wife will have~~ joint legal custody of the minor children who will make their primary home with the Wife.

B. The Husband will continue to visit with the Children according to the Visitation schedule currently in place, subject to changes agreed upon by the parties, after consultation with each other, or at the direction of the court appointed guardian ad litem. The Court's order with the respect to the appointment of Belle Sulloway as guardian ad litem will be incorporated ~~into this Agreement and into the Judgment of Divorce.~~

A. In lieu of child support, the Husband will continue to make the *PAR. 5 -* payments with respect to the marital home set forth in Exhibit A, until the first to occur of the emancipation of the youngest child or the sale of the marital home. If the marital home is sold while the children or either of them are unemancipated, the Husband will pay child support in accordance with the Massachusetts child support guidelines.

B. Emancipation of the minor children under the within agreement shall be deemed to take place upon the earliest happening of any of the following contingencies:



-14-

1.    Attaining the age of eighteen (18) or three (3) months after graduation from High School, whichever occurs later, unless a child is then currently enrolled as a full-time student at an accredited college or university;

2.    Graduation from four years of higher education, but no later than the youngest child's twenty-third birthday;

3.    Entry into the military service;

4.    Marriage of the children;

5.    Death of the children;

6.    Engaging in full time, permanent employment after the age of eighteen (18), except that full-time employment during vacation and summer periods shall not be deemed emancipation. Such emancipation shall be deemed to terminate upon cessation by the child from full-time employment; thereafter, emancipation shall be determined in accordance with the other applicable provisions of this section.

C.    Neither party shall permanently remove the Children from the Commonwealth of Massachusetts without the express consent of the other or by further order of the ~~Plymouth~~ Norfolk Probate and Family Court.

E.    Neither party shall attempt to, or condone any attempt, to injure or impede the respect or affection of the children for the other, but on the contrary shall, at all times, encourage and foster in the children respect and affection for both parents. Each party shall exert every reasonable effort to maintain free access and unhampered contact between the children and the other party and neither shall do anything which may hamper the free and natural development of the children's love and respect for the other.



-15-

EXHIBIT D

HEALTH INSURANCE & UNINSURED MEDICALS

A.     The Husband and Wife shall maintain the family plan health
insurance available to her through her employer for the benefit of the
*as long as the other spouse is* ☑
unemancipated children and the other spouse ∧with the Husband's  *eligible for*
*Same at no*
insurance being the primary carrier and the Wife's being the secondary *additional co*
carrier, so as to eliminate or minimize uninsured medicals, *providing this* ✱

B.     The Husband and the *Wife* will equally divide the cost of uninsured
medical and dental expenses for the Children from the date of the
separation (August, 1997), with each receiving credit for what they have
already paid. Each will be responsible for their own uninsured medical and
dental expenses.

C.     To the extent practical and in those cases not involving
emergency, neither parent shall incur extraordinary or major expenses in
the child's behalf without first notifying the other of his or her intentions
in this regard and obtaining the other's approval, which approval shall not
be unreasonably withheld.

D.     It shall be the responsibility of the uninsured party to deal
directly with the insured party's plan or group, to complete any and all
applications, and to make any and all arrangements with said plan or
group; however, the insured party shall cooperate and do all things
necessary to assist the uninsured party to obtain any such health
insurance.

✱ *insurance is available to the wife at no cost.*



-16-

E.    The Husband and the Wife shall cooperate with each other in the processing of all claims for benefits due under the health insurance policy, and each shall execute and deliver whatever documents are necessary to effect the within covenant.

F. The party herinabove required to provide said insurance coverage shall provide to the other party proof of said coverage upon ten (10) days notice.



EXHIBIT E

LIFE INSURANCE

1. The Husband agrees to maintain his present life insurance policy *having a present death benefit of $250,000* or its successor in the amount sufficient to insure his obligations under this Agreement with ~~the Wife and~~ Children as beneficiaries *a Trust for the benefit of the, with a Trustee or Trustees mutually agreeable to both parties,* until the youngest child is emancipated and to provide the Wife with evidence of such coverage upon request.

2. The Wife agrees to maintain her existing life insurance/with the *with a present death benefit of $5,000* Husband as beneficiary until the youngest child is emancipated and to provide the Husband with evidence of such coverage upon request.

3. The Husband and the Wife shall at all times keep said insurance policies in full force and effect, shall pay all premiums, dues and assessments thereon and shall upon request transmit to the Wife copies of receipts showing that such dues, premiums and assessments have been paid.

4. The Husband and the Wife shall not borrow against such policies, nor in any manner pledge or encumber the same, so as to reduce the death benefits below the amounts required by this Agreement without the prior consent of the other.



-18-

5. If the Husband or the Wife fail to pay the premiums on the required insurance and failure to pay such premiums would reduce the aggregate death benefits below the amount required by this Agreement from time to time, each shall have the option to pay same, or to convert the policies or any of them into paid-up insurance, or each may surrender and cancel the policies or any of them and receive cash payment thereon.

6. If the policies are not in full force and effect at the time of the Husband or the Wife's death, or if the Husband or the Wife being then entitled to receive full proceeds thereof, does not receive the same, then notwithstanding anything to the contrary contained in this Agreement, the Husband or the Wife will have a creditor's claim against the other party's estate for the difference between the face amount of the policies to be required to be maintained under this Agreement at the time of the Husband or the Wife's death and the amount he or she actually receives thereof upon such death, less any amounts he or she may have received upon surrender and cancellation of these policies,



-19-

EXHIBIT F

FINANCIAL DISCLOSURE

The parties hereby warrant and represent that they have fully and completely disclosed all income well as liabilities and debts owed, on the financial statements each has filed with the Court to the best of his or her knowledge and ability and that the representations contained therein may be reasonably relied upon by the other.

The failure of either party to disclose any asset, liability or income presently known to them or their respective financial statements shall be deemed to be a fraudulent representation sufficient to justify the voiding of contractual obligations.



-20-

EXHIBIT G

ATTORNEY'S FEES

A.     The parties shall each pay their own legal fees and expenses incurred in connection with the negotiation and preparation of this Agreement and all related matters.

B.     If either the Husband or the Wife shall default after written notice in any of his or her obligations hereunder, the party in default shall be required to pay any and all reasonable counsel fees and expenses incurred by the other party in enforcing any of the terms and provisions of this Agreement.



-21-

EXHIBIT H

TAX TREATMENT

1.    The Husband and the Wife shall alternate claiming the

dependency exemptions for the minor children, for federal and state tax

purposes. ~The wife shall be entitled to the 1997 dependency deduction~ The Husband shall claim the children in 1998 and the Wife shall

claim the Children in 1999.

2. The husband shall be entitled to the deduction relating to the interest and taxes on the marital home for 1997. From ~~1997~~ 1998, on, each of the parties will be entitled to one-half of the deduction for the ~~interest~~, interest and taxes on the marital home. MORTGAGE PAYMENT

* and the husband will execute any form necessary to complete this.



-22-

# THE COMMONWEALTH OF MASSACHUSETTS
## THE TRIAL COURT

**PROBATE FAMILY COURT DEPARTMENT**

PROBATE & FAMILY COURT
No. _971)-1237_

NORFOLK DIVISION _Margaret Livingston_, Plaintiff

v.

_Richard Livingston_, Defendant

STIPULATION
OF THE
PARTIES

It is hereby agreed by the parties with the advice of counsel that the following stipulation shall be made an order or judgment of this court:

1. The Wife will have legal and physical custody of the minor children who will make their primary home with her.

2. The husband will continue to visit with the children according to the visitation schedule currently in place, AS IN THE ATTACHED EXHIBIT "A"

3. The Court's order with respect to the appointment of Belle Soloway as guardian ad litem for the children will be incorporated in the Judgment of Divorce nisi, AND/OR ATTACHED EXHIBIT HERETO AS "B"

Plaintiff _Margaret Livingston_

Defendant _Richard Livingston_

Plaintiff's Attorney _Elliott Sherin_

Defendant's Attorney _Danielle deDiodati_

Date: _12/14/98_

Witness: _____

IH-1

EXHIBIT "A"

2.  The daughter (Siobhan) and the husband will visit with each other
    as agreed upon between them.  The husband agrees to participate in
    therapy with the daughter, unless the daughter objects to such
    participation, with a therapist to be chosen by the clinical G.A.L.
    In order to facilitate communicate between the husband and
    daughter.

*when he will pick Brendan up the
after school at the wife's home.*

3.  During the school year the husband will visit with the son (Brendan)
    every other weekend from Friday after school until Monday
    morning when the husband will return Brendan to school.  If a
    holiday falls on a Monday the husband will return Brendan to the
    marital home by 7:30p.m.

4.  During the school year, the husband will visit with Brendan every
    Tuesday after school when the husband will pick up Brendan at
    school until 7:30a.m. during the school year, and 8:30 in the
    summer when the wife will pick Brendan up at the husbands home.

-1-



5.   During the school year, on Thursday when the husband does not have Brendan for the weekend, he will also visit with Brendan from after school until 7:30p.m. during the school year, and 8:30 in the summer, or from after any activity Brendan has which the husband shall accommodate. The husband will return Brendan to the marital home after such visits.

6.   Subject to the foregoing the husband and the wife will equally divide the time Brendan is not in school by alternating Christmas, New Years, Thanksgiving and Easter as well as the February and Spring school vacation. They will also, subject to paragraph "7." below, equally divide the summer vacation.

7.   During the time Brendan is with the father he will visit with the mother according to the same schedule that he visits with father. When Brendan is with each of the parents during the summer each parent will be on vacation spending time with Brendan or provide a five day program for Brendan. Anytime either parent is unable to personally be with Brendan or not in a program of camp or school, the other parent will have the presumptive right to be with Brendan, rather than his being left with other caretakers.

8.   Each of the parties may take the children outside of the Commonwealth of Massachusetts for purposes of vacation. Before any such trip the departing parent will give the other parent the home, address and phone number of wherever they will be.

9.   Notwithstanding any contrary provision of this order, of the foregoing Brendan will be with the father for father's day, the mother for mother's day and will equally divide his time between the mother and father on his birthday.

10.  When Brendan is with the husband or the wife the parent with whom Brendan is staying shall provide the other with the name address and phone number of where to reach the child.

11.  The husband and the wife will limit his/her telephone calls to Brendan when he is not with them the call of one per day. Brendan will be free to contact the husband and the wife whenever he wishes and will be encouraged to do so.



12. The parties will be flexible in changing-schedule to accommodate Brendan's activities and Brendan's access to each of the parties extended families. Anytime that either parent is scheduled to be with Brendan which he/she agrees to forego in the spirit of cooperation shall be made up within the next week.

13. Both parents shall be consulted and have input into the choice of elected physical and mental medical care of the children and neither shall unreasonably with hold their consent to same.

14. The parties shall immediately notify each other of any and all illnesses and problems that afflict the children and each parent shall have the right to visit his or her sick child at the home of the other as often within reason, as that child shall wish.

15. In the event of emergency affecting the children both parents will notify the other immediately.

16. The parties shall participate in all school conferences schedules for the children and shall share in communicating the dates and times and places for such conferences and meetings.

17. The husband and wife will cooperate with each other with respect to the children and will have continued mutual responsibility and involvement in all decisions, regarding the happiness and welfare of the children. In furtherance of said objective, the husband and wife shall do all they can to raise the children and to work together to solve all problems which may affect the children in matters of education and medical care as well as their social, emotional and spiritual development.

18. Neither the husband and the wife shall make derogatory remarks about the other and particularly in front of the children nor and/or discuss pertinent decision making in from of the children.

19. Any dispute between the parties relative to the issues addressed here under shall in the first instance, be refer to the Clinical G.A.L. appointed pursuant to paragraph "20." below.



20.     The parties shall hereafter submit disputes regarding visitation, and any other disputes concerning matters addressed by this temporary order, to Belle Soloway, Esq. of 30 Eastbrook Road, Suite 301, Dedham, Mass., (telephone no. 781-326-8277) who is herein designated and appointed as the Clinical GAL for such purposes. The parties shall submit all such disputes to the Clinical GAL prior to their filing of any motion or complaint with this Court relative to said issue(s), the Clinical GAL shall hear from the parties and meet with, or hear from any third parties who, in her opinion, would be necessary and helpful to her in his role as Clinical GAL. With regard to any issue being presented to her, she shall provide to each party a written recommendation(s) with regard to any such issue being mediated. His/her written recommendations(s) with regard to any issue being presented shall be given to the parties and shall, immediately upon their receipt of said recommendation(s), be binding upon them until this Court enters, by motion or otherwise, pursuant to a pending or properly filed and served complaint, an order or judgment altering, modifying or terminating said recommendation(s). At this time of any such review, the Court shall also consider an award of fees and expenses of the proceedings before the Clinical GAL and the Court proceeding in the event that the Court concludes that a party was acting unreasonably or not in good faith or that the basis for an objection, or the opposition to an objection, to the Clinical GAL's written recommendation(s) lacked merit.



*EXHIBIT H*

**Commonwealth of Massachusetts**
**The Trial Court**
**Probate and Family Court Department**

Norfolk Division                                                      Docket No.97D1237-D1

Margaret Livingston, Plaintiff

vs.

Richard Livingston, Defendant

**APPOINTMENT OF GUARDIAN AD LITEM**

        The parties shall hereafter submit disputes regarding visitation, and any other disputes
concerning matters addressed by this temporary order, to Belle Soloway, Esq. of 30 Eastbrook
Road, Suite 301, Dedham, Mass., (telephone no. 781-326-8277) who is herein designated and
appointed as the Clinical GAL for such purposes.  The parties shall submit all such disputes to
the Clinical GAL prior to their filing of any motion or complaint with this Court relative to said
issue(s), the Clinical GAL shall hear from the parties and meet with, or hear from any third
parties who, in her opinion, would be necessary and helpful to her in his role as Clinical GAL.
With regard to any issue being presented to her, she shall provide to each party a written
recommendation(s) with regard to any such issue being mediated.  His/her written
recommendations(s) with regard to any issue being presented shall be given to the parties and
shall, immediately upon their receipt of said recommendation(s), be binding upon them until this
Court enters, by motion or otherwise, pursuant to a pending or properly filed and served
complaint, an order or judgment altering, modifying or terminating said recommendation(s).  At
this time of any such review, the Court shall also consider an award of fees and expenses of the
proceedings before the Clinical GAL and the Court proceeding in the event that the Court
concludes that a party was acting unreasonably or not in good faith or that the basis for an
objection, or the opposition to an objection, to the Clinical GAL's written recommendation(s)
lacked merit.

        The Clinical GAL shall be paid at her normal hourly rate, including a requested retainer if
any, and the cost thereof, are to be paid by the parties in accordance with the following
percentages: 50% by the father, and 50% by the mother, unless the Court, by subsequent order,
may determine otherwise. ~~The parties shall attend either weekly or monthly sessions with such clinical GAL, which shall be that payments (be) made at telephone conferences which shall be then determined at each of such occasion.~~

        July 16, 1998                                    /s/ Robert W. Langlois
             Date                              Robert W. Langlois, Justice
                                               Norfolk Probate and Family Court

IN THE EVENT THAT EITHER PARTY TELEPHONES THE GAL
MORE THAN TWICE PER WEEK (AT A MAXIMUM OF 20 MINS. PER CALL
THERE SHALL BE A REBUTTABLE PRESUMPTION THAT SUCH
PARTY SHALL PAY FOR ANY TIME IN EXCESS OF SUCH
CALLS.

# EXHIBIT 4

CONVERTED

# United States Bankruptcy Court
# District of Massachusetts (Boston)
# Bankruptcy Petition #: 01-11602

*Assigned to:* Judge Joan N. Feeney
Chapter 7
Previous chapter 13
Voluntary
No asset

*Date Filed:* 03/07/2001
*Date Converted:*
04/04/2001
*Date Terminated:*
01/10/2002
*Date Discharged:*
07/26/2001

**Richard L. Livingston**
149 Warren Ave.
Milton, MA 02186
SSN: xxx-xx-0332
*Debtor*
*aka*
**Richard Lawrence Livingston**

represented by **William E. Gately, Jr.**
Law Office Of William E. Gately, Jr.
400 Washington St.
Braintree, MA 02185
(781) 848-1200

**Joseph G. Butler**
Barron & Stadfield
100 Cambridge Street
Suite 1310
Boston, MA 02114
617-723-9800
*Trustee*



Certified to be a true and
correct copy of the original
James M. Lynch, Clerk
U.S. Bankruptcy Court
District of Massachusetts
By: *Maureen Mattes*
Deputy Clerk
Date: *July 11, 2006*

| Filing Date | # | Docket Text |
|---|---|---|
| 03/07/2001 | 1 | Voluntary Chapter 13 Petition ( Filing Fee $ 185.00 Rcpt # ) missing documents: Chapter 13 Plan due on 4:30 3/22/01 ; Proof of Claim (gov. units only) Deadline: 4:30 9/4/01 (mjv) (Entered: 03/08/2001) |
| 03/07/2001 | | Matrix. (mjv) (Entered: 03/08/2001) |
| 03/07/2001 | 2 | Disclosure of Compensation filed by Attorney William E. Gately for the Debtor in the amount of $ 1100.00. (mjv) |

| | | (Entered: 03/08/2001) |
|---|---|---|
| 03/08/2001 | 3 | Order to Update Petition. Incomplete Filing; missing documents: Chapter 13 Plan ; Missing Documents Due 4:30 3/23/01 (mjv) (Entered: 03/08/2001) |
| 03/19/2001 | 4 | Installment Fee Paid in full. ( Receipt #: 464063 Amount: $ 185.00) (mjv) (Entered: 03/19/2001) |
| 03/28/2001 | 5 | Motion By Debtor Richard L. Livingston To Extend Time To File Chapter 13 Plan To April 3, 2001 c/s. (pkn) (Entered: 03/28/2001) |
| 03/28/2001 | 6 | ENDORSEMENT ORDER: Granting [5-1] Motion To Extend Time To File Chapter 13 Plan To April 3, 2001 by Richard L. Livingston ;Chapter 13 Plan due on 4:30 4/3/01 MOTION ALLOWED. (pkn) (Entered: 03/29/2001) |
| 03/28/2001 | | Update Deadline On Chapter 13 plan due on 4:30 4/3/01 (pkn) (Entered: 03/29/2001) |
| 04/04/2001 | 7 | Motion by Debtor To Convert Case From Chapter 13 to Chapter 7 c/s (pkn) (Entered: 04/04/2001) |
| 04/04/2001 | 8 | ENDORSEMENT ORDER: [7-1] Motion To Convert Case From Chapter 13 to Chapter 7 by Debtor, Trustee Doreen B. Solomon terminated. MOTION ALLOWED (pkn) (Entered: 04/05/2001) |
| 04/04/2001 | | Update Deadline On Missing Documents due on 4:30 4/20/01 (pkn) (Entered: 04/05/2001) |
| 04/05/2001 | 9 | Order to Update Petition. Incomplete Filing; missing documents: ; Missing Documents Due 4:30 4/20/01 (pkn) (Entered: 04/05/2001) |
| 04/05/2001 | 10 | Certificate of Appointment and Acceptance of Trustee Joseph Butler and Fixing of Bond. (lml) (Entered: 04/05/2001) |
| 04/05/2001 | | First Meeting of Creditors scheduled For 10:30 5/16/01 At 10 Causeway Street, Room 255-B Last Day To Oppose |

| | | |
|---|---|---|
| | | Discharge: 4:30 7/16/01 Notice to be mailed within two weeks. (lml) (Entered: 04/05/2001) |
| 04/09/2001 | 11 | Motion By Creditor Margaret Clifford For Relief from Automatic Stay ( Filings For Judgment Dedham District Court) Without Certificate of Service. FFP (pkn) (Entered: 04/09/2001) |
| 04/11/2001 | 12 | Notice of Appearance And Request For Service Of Notice By Nina M. Parker for Creditor Margaret Clifford. (pkn) (Entered: 04/11/2001) |
| 04/11/2001 | 13 | Amended Motion by Creditor Margaret Clifford For Relief from Automatic Stay ( Proceed In Probate and Family ) , For Expedited Determination Re: [13-1] RE: [11-1] Motion For Relief from Automatic Stay ( Filings For Judgment Dedham District Court) by Margaret Clifford c/s. (pkn) (Entered: 04/11/2001) |
| 04/11/2001 | 14 | Motion By Debtor Richard L. Livingston To File Amended Matrix and Schedule F [1-1] Voluntary Petition, [0-0] Matrix c/s (pkn) (Entered: 04/12/2001) |
| 04/12/2001 | 15 | ENDORSEMENT ORDER: [13-2] Motion For Expedited Determination Re: [13-1] RE: [11-1] Motion For Relief from Automatic Stay ( Filings For Judgment Dedham District Court) by Margaret Clifford REQUEST FOR EXPEDITED DETERMINATION GRANTED. (pkn) (Entered: 04/12/2001) |
| 04/12/2001 | | Hearing Re: [13-1] Motion For Relief from Automatic Stay ( Proceed In Probate and Family ) by Margaret Clifford set For 10:00 4/24/01 at Courtroom 1, Objections to Motion Due On: 12:00 4/20/01 (pkn) (Entered: 04/12/2001) |
| 04/12/2001 | 16 | Notice of Hearing Creditor Margaret Clifford [13-1] Motion For Relief from Automatic Stay ( Proceed In Probate and Family ) by Margaret Clifford set For 10:00 4/24/01 at Courtroom 1, Objections to Motion Due On: 12:00 4/20/01 (pkn) (Entered: 04/12/2001) |
| 04/12/2001 | 17 | Certificate Of Service By Creditor Margaret Clifford Of |

| | | [16-1] Hearing Notice by Margaret Clifford . (pkn) (Entered: 04/12/2001) |
|---|---|---|
| 04/12/2001 | 18 | ENDORSEMENT ORDER: [14-1] Motion To File Amended Matrix and Schedule F [1-1] Voluntary Petition, [0-0] Matrix by Richard L. Livingston MOTION ALLOWED. (pkn) (Entered: 04/13/2001) |
| 04/18/2001 | 19 | Emergency Motion By Debtor To Extend Time To File Objection To Motion and Amended Motion For Relief , To Continue Hearing Presently Scheduled 4/24/01 On: ( [13-1] Motion For Relief from Automatic Stay ( Proceed In Probate and Family ) by Margaret Clifford set For 10:00 4/24/01 at Courtroom 1, Objections to Motion Due On: 12:00 4/20/01 ) , For Expedited Determination Re: c/s (pkn) (Entered: 04/18/2001) |
| 04/19/2001 | 20 | ENDORSEMENT ORDER: [19-3] Motion For Expedited Determination Re: by Debtor [19-2] Motion To Continue Hearing Presently Scheduled 4/24/01 On: ( [13-1] Motion For Relief from Automatic Stay ( Proceed In Probate and Family ) by Margaret Clifford set For 10:00 4/24/01 at Courtroom 1, Objections to Motion Due On: 12:00 4/20/01 ) by Richard L. Livingston, [19-1] Motion To Extend Time To File Objection To Motion and Amended Motion For Relief by Richard L. Livingston MOTION ALLOWED IN PART. THE TIME WITHIN WHICH TO FILE A RESPONSE IS EXTENDED UNTIL APRIL 23, 2001 AT NOON. THE HEARING DATE SHALL REMAIN UNCHANGED. (pkn) (Entered: 04/19/2001) |
| 04/23/2001 | 21 | Motion Opposing By Debtor To [11-1] Motion For Relief from Automatic Stay ( Filings For Judgment Dedham District Court) by Margaret Clifford . c/s (pkn) (Entered: 04/23/2001) |
| 04/23/2001 | 22 | Memoranda By Debtor In Support Of [21-1] Objection Debtor To [11-1] Motion For Relief from Automatic Stay ( Filings For Judgment Dedham District Court) by Margaret Clifford . by Richard L. Livingston . (pkn) (Entered: 04/23/2001) |
| | | |

| | | |
|---|---|---|
| 04/23/2001 | 23 | Post Chapter 13 Creditors by Debtor (pkn) (Entered: 04/23/2001) |
| 04/24/2001 | | Hearing Held Re: [13-1] Motion For Relief from Automatic Stay ( Proceed In Probate and Family ) by Margaret Clifford . (pkn) (Entered: 04/24/2001) |
| 04/24/2001 | 24 | ORDER: [13-2] Motion For Expedited Determination RE: [13-1] Amended Motion For Relief From Stay [11-1] Motion For Relief from Automatic Stay by Margaret Clifford #13 GRANTED. SEPARATE ORDER ENTERED. (pkn) (Entered: 04/24/2001) |
| 04/24/2001 | 25 | ORDER: Granting [13-1] Motion For Relief from Automatic Stay ( Proceed In Probate and Family ) by Margaret Clifford . (pkn) (Entered: 04/24/2001) |
| 04/26/2001 | 26 | First Meeting Certificate of Mailing. (auto) (Entered: 04/26/2001) |
| 05/16/2001 | | First Meeting Held and Examination of Debtor. (kmp) (Entered: 05/25/2001) |
| 06/05/2001 | 27 | Chapter 13 Trustee's Report and Account and Request for Debtor's Discharge Filed and Accepted. (pkn) (Entered: 06/06/2001) |
| 06/07/2001 | 28 | Order Pursuant to 11 U.S.C. Section 350(a), the Court hereby discharges the Chapter 13 Trustee. (pkn) (Entered: 06/08/2001) |
| 07/26/2001 | 29 | Order Discharging Debtor Richard L. Livingston (pkn) (Entered: 07/26/2001) |
| 07/31/2001 | 30 | Discharge Certificate of Mailing. (auto) (Entered: 07/31/2001) |
| 10/26/2001 | 31 | Trustee's Report of No Distribution. (pkn) (Entered: 10/29/2001) |
| 11/02/2001 | 32 | Motion By Debtor For EMERGENCY Hearing MLRB 9013-01-(h) . Exhibits. c/s. (sav) (Entered: 11/02/2001) |

| 11/02/2001 | 33 | Motion By Debtor For Limitation of Service MLRBP 901301(h)(2) Re: [32-1] Motion For EMERGENCY Hearing MLRB 9013-01-(h) by Richard L. Livingston (sav) (Entered: 11/02/2001) |
|---|---|---|
| 11/06/2001 | 34 | ORDER: Denying [32-1] Motion For EMERGENCY Hearing MLRB 9013-01-(h) by Richard L. Livingston (in part) THE COURT HEREBY DENIES THE DEBTOR'S MOTION FOR EMERGENCY HEARING AS THE RELIEF REQUESTED BY THE DEBTOR IS BARRED BY THE ROOKER-FELDMAN DOCTRINE.1 THE DEBTOR'S REMEDY, IF ONE EXISTS, IS AN APPEAL FROM THE ORDERS OF THE PROBATE COURT. (pkn) (Entered: 11/06/2001) |
| 01/10/2002 | 35 | Order to Close Case and Discharge Trustee. (pkn) (Entered: 01/10/2002) |
| 01/10/2002 | | Case Closed. (pkn) (Entered: 01/10/2002) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/11/2006 11:53:56 | | | |
| **PACER Login:** | us4967 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 01-11602 Fil or Ent: Fil Doc From: 0 Doc To: 99999999 Links: n Format: HTMLfmt |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

01-11602-JNF

CHAPTER 7

)
)
IN RE RICHARD L. LIVINGSTON )          ORDER
)
_____ )

Upon consideration of the motion of Margaret Clifford for relief from the automatic stay of proceedings, a hearing having been held on said motion and all parties having been notified of said hearing, and with good cause appearing therefore, this court makes its ORDER as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Automatic Stay in the above Bankruptcy proceeding is vacated and extinguished for all purposes as to the Movant, her assignees and/or successors in interest, and the Movant may proceed to assert her rights against the Debtor within the divorce proceeding between the Debtor and Clifford and more fully described in Livingston v. Livingston, Norfolk County Probate and Family Court, Docket No. 97D1237-D1 by means any means necessary, all pursuant to applicable state and federal law.

IT IS FURTHER ORDERED that Clifford is relieved from the Rule 4001 (a) (3) stay, such that she is allowed to proceed against the Debtor immediately upon the Court's signing of this Order.

April 24, 2001
Date

Joan N. Feeny
Bankruptcy Judge

Certified to be a true and correct copy of the original
James M. Lynch, Clerk
U.S. Bankruptcy Court
District of Massachusetts
By: Maureen Mather
Deputy Clerk
Date: July 11, 2006

DOCKETED

# EXHIBIT 6

BK 15350 PG 263

36
20

Return To:

Prepared By:
Elaine C. Hill

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY

PAUL D. HAROLD, REGISTER

——————————[Space Above This Line For Recording Data]——————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    July 27, 2001    ,
together with all Riders to this document.
**(B) "Borrower" is** Margaret Clifford    a/k/a Margaret Livingston

a/k/a Margaret M. Livingston

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender" is** Chittenden Trust Co. d/b/a Mortgage Service Center

*Lender is a* Corporation
organized and existing under the laws of    Vermont

CLIFFORDMAR 830
**MASSACHUSETTS-**Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3022 1/01

-6(MA) (0005)

Page 1 of 15    MW 05/00    Initials:

VMP MORTGAGE FORMS - (800)521-7291

009069

01 AUG -1 PH 2:40

## BK I 5350 PG 264

Lender's address is  629 Putney Road, Brattleboro, VT 05301

Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated     July 27, 2001
The Note states that Borrower owes Lender One Hundred Sixty Thousand and no/100
                                                                    **Dollars**
(U.S. $160,000.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than     August 1, 2031     .
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider  [ ] Condominium Rider              [ ] Second Home Rider
[ ] Balloon Rider          [ ] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider               [ ] Biweekly Payment Rider         [ ] Other(s) [specify]

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

CLIFFORDMAR 830

-6(MA) (0005)                    Page 2 of 16                    Initials: _____    Form 3022  1/01

BK 15350 PG 265

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the      Registry of Deeds                                    [Type of Recording Jurisdiction]
of              Norfolk County              [Name of Recording Jurisdiction]:

See Exhibit A attached hereto

Parcel ID Number:                                              which currently has the address of
15 Quarry Lane                                                                         [Street]
Milton                                  [City] , Massachusetts    02186    [Zip Code]
("Property Address"):

      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

      THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

      UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

      1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

CLIFFORDMAR 830

[logo] -6(MA) (0005)                        Page 3 of 15              Initials: [signature]              Form 3022  1/01

BK 15350PG266

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

CLIFFORDMAR 830

## BK 15350PG267

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

CLIFFORDMAR 830

BK 15350PG268

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

CLIFFORDMAR 830

BK 15350PG269

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

CLIFFORDMAR 830

 -6(MA) (0005)

Page 7 of 15

Initials: 

Form 3022  1/01

BK 15350PG270

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

CLIFFORDMAR 830

BK15350PG271

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

CLIFFORDMAR 830

-6(MA) (0005)                          Page 9 of 15                    Initials: _____              Form 3022   1/01

BK 15350PG272

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

CLIFFORDMAR 830

-6(MA) (0005)          Page 10 of 15          Initials:          Form 3022  1/01

BK 15350PG273

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

CLIFFORDMAR 830

## BK 15350 PG 274

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

CLIFFORDMAR 830

BK 15350PG275

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall he sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.    See Book 14899/112

CLIFFORDMAR 830

-6(MA) (0005)                    Page 13 of 15                    Initials: _____    Form 3022  1/01

BK 15350PG276

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ 
Victoria Hayward Schepps

_____ (Seal)
Margaret Clifford                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)        _____ (Seal)
                    -Borrower                            -Borrower

_____ (Seal)        _____ (Seal)
                    -Borrower                            -Borrower

_____ (Seal)        _____ (Seal)
                    -Borrower                            -Borrower

CLIFFORDMAR 830

-6(MA) (0005)                    Page 14 of 15                    Form 3022  1/01

## BK 15350PG277

**COMMONWEALTH OF MASSACHUSETTS,**                    Norfolk    County ss:

On this    27th    day of    .   July, 2001              , before me personally appeared
Margaret Clifford

to me known to be the person(s) described in and who executed the foregoing instrument, and
acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires:
09/18/03

Notary Public
Victoria Hayward Schepps

CLIFFORDMAR 830

-6(MA) (0005)              Page 15 of 15              Initials:               Form 3022  1/01

BK 15350 PG 278

EXHIBIT A

A certain parcel of land with the buildings thereon situated on the southwesterly side of Quarry Lane in Milton, Massachusetts, being shown as Lot B on a plan entitled "Plan of Lot Subdivision on Pleasant Street and Quarry Lane, Milton, Massachusetts, Scale: 1" = 20'," by John H. Bowie, Civil Engineer, dated February 14, 1933, recorded with Norfolk Registry of Deeds as Plan No. 156 of 1933 in Book 1987, Page End, bounded and described, according to said plan, as follows:

NORTHEASTERLY   by Quarry Lane, sixty (60) feet;

SOUTHEASTERLY   by land of James Cullen, et al, one hundred and 49/100 (100.49) feet;

SOUTHWESTERLY   by Lot A, sixty-two and 60/100 (62.60) feet; and

NORTHWESTERLY   by Lot C, ninety-two and 18/100 (92.18) feet.

Containing 5,595 square feet, according to said plan.

For title reference, see Deed from Thomas L. Richards and Edith Richards, to us, dated July 23, 1984, recorded on September 6, 1984, with the Norfolk Registry of Deeds, Book 6491, Page 137.

BK 15350PG279

# ADJUSTABLE RATE RIDER
### (1 Year Treasury Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this       27th       day of  July, 2001       ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage,
Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
Chittenden Trust Co. d/b/a Mortgage Service Center

(the "Lender") of the same date and covering the property described in the Security Instrument and
located at:

15 Quarry Lane,Milton,MA 02186
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of       7.6250       %. The Note provides for
changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the first day of       August, 2004       ,
and on that day every 12th month thereafter. Each date on which my interest rate could change is called a
"Change Date."

**MULTISTATE ADJUSTABLE RATE RIDER - ARM 5-2 -Single Family- Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT**
Fannie Mae 4-2/5-2/6-2 ARM
-822R (0008)       Form 3111 1/01
Page 1 of 4    MW 04/99    Initials:
VMP MORTGAGE FORMS - (800)521-7291



CLIFFORDMAR 830

BK 15350PG280

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and Three / Quarters                                                                  percentage points
(     2.7500     %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than
9.6250     % or less than          5.6250          %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than          13.6250          %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

CLIFFORDMAR 830

-822R (0008)                         Page 2 of 4               Initials: _____          Form 3111 1/01

BK 15350PG281

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _____

822R (0008)          Page 3 of 4          Form 3111 1/01

CLIFFORDMAR 830

BK 15350PG282

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
Margaret Clifford          -Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
                           -Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
                           -Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
                           -Borrower                               -Borrower

CLIFFORDMAR 830

-822R (0008)                    Page 4 of 4                    Form 3111 1/01

A true copy from Lib. 15350 Fol. 263
in Norfolk County Registry of Deeds
Dedham, MA
Certify: *William P O'Donnell*
                                        Register

# EXHIBIT 7

**EXHIBIT A**



**Property Address:**

15 Quarry Lane
Milton, MA 02186

**Appraisal Prepared For:**

Mortgage Service Center
629 Putney Road, Brattleboro, Vt 05305



RECEIVED
JUN 2 9 2001
By

**Prepared As Of:**

01/18/01

**Prepared By:**

Paul Falconer
Falconer Appraisal Services, Inc.
23 Pinewood Road, Plymouth, MA 02360

January 24, 2001

Mortgage Service Center
629 Putney Road
Brattleboro, Vt 05305

Re: Richard & Margaret Livingston

Dear Client:

In accordance with your request, I have personally inspected and submit a complete summary appraisal report of the real property located at:

15 Quarry Lane
Milton, MA 02186

The purpose of the appraisal was to estimate the market value of the property, as improved, in fee simple, and unencumbered by liens. The scope of the assignment is based on information gathered by the appraiser. from public records, other identified sources and the exterior inspection of the subject and the comparables, unless otherwise stated. The appraisal assumes there are no adverse environmental conditions as the basis of the evaluation. Any adverse environmental conditions identified at a later date would deem the valuation invalid.

In my opinion, the estimated market value of the property, as of :
        01/18/01          is: $340000.

The attached complete summary appraisal reports contains the description, analysis and supportive data needed for the conclusions drawn in the final value estimate. Descriptive photographs of the subject and comparables have been attached.

It has been a pleasure to assist you. If I may be of further service in the future, please, let me know.

Respectfully submitted,

Paul Falconer
Massachusetts Certified General Real Estate Appraiser
#530

## APPRAISAL SUMMARY

| | | |
|---|---|---|
| **SUBJECT INFORMATION** | Subject Address . . . . . . . . . . . . . . . | 15 Quarry Lane |
| | Legal Description . . . . . . . . . . . . . | Book 6777 page 504 |
| | City . . . . . . . . . . . . . . . . . . . . . . . . | Milton |
| | County . . . . . . . . . . . . . . . . . . . . . . | Norfolk |
| | State . . . . . . . . . . . . . . . . . . . . . . . | MA |
| | Zip Code . . . . . . . . . . . . . . . . . . | 02186 |
| | Census Tract . . . . . . . . . . . . . . . . | 4161 |
| | Map Reference . . . . . . . . . . . . . . . | MI5-7 |
| **SALES PRICE** | Sales Price  $ . . . . . . . . . . . . . . . . | Refinance |
| | Date of Sale . . . . . . . . . . . . . . . . . | N/A |
| **CLIENT** | Borrower/Client . . . . . . . . . . . . . . . | Richard & Margaret Livingston |
| | Lender . . . . . . . . . . . . . . . . . . . . . | Mortgage Service Center |
| **DESCRIPTION OF IMPROVEMENTS** | Size (Square Feet) . . . . . . . . . . . . . | 1300 |
| | Price per Square Foot . . . . . . . . $ | N/A |
| | Location . . . . . . / . . . . . . . . . . . . . | Milton Village |
| | Age . . . . . . . . . . . . . . . . . . . . . . . | 123 yrs. |
| | Condition . . . . . . . . . . . . . . . . . . . | Average |
| | Total Rooms . . . . . . . . . . . . . . . . | 6 |
| | Bedrooms . . . . . . . . . . . . . . . . . . | 3 |
| | Baths . . . . . . . . . . . . . . . . . . . . . . | 1.50 |
| **APPRAISER** | Appraiser . . . . . . . . . . . . . . . . . . . | Paul Falconer |
| | Date of Appraised Value . . . . . . . | 01/18/01 |
| **VALUE** | Final Estimate of  Value . . . . . . . $ | 340000 |

# EXHIBIT 8

**Exhibit B-9-1**

07/29/01  SUN 22:41 FAX 1 802 258 5115        MCS                    ☒001

JUL-26-2001 THU 04:10 PM MBTA CU        FAX NO. 916177392720        P. 02/02

*Clifford*

### MBTA Employees Credit Union
*147 West Fourth Street*
*South Boston, MA 02127*
*(617)269-2700 Tel.*
*(617)269-2720 Fax*

<u>MORTGAGE PAYOFF INQUIRY</u>

Borrower(s) Name: *Richard Livingston* Acct# *209173 M1*

| | | |
|---|---|---|
| 106,608.39 | | Principle Balance |
| 534.51 | + | Interest Due |
| -0- | + | Late Fees |
| 107,142.90 | = | Total Due (Principle & Interest) |
| 534.48 | - | Escrow Balance |
| 106,608.42 | = | Total Payoff Amount*** |

*** -0-            Deferred Interest (if applicable)
                    Verified by _____

20.36            Per Diem

7-26-01

**VICTORIA HAYWARD SCHEPPS**
Attorney at Law
Clients Fund Account
6 CABOT PLACE, SUITE 9
STOUGHTON, MASSACHUSETTS 02072

| EXPLANATION | AMOUNT |
|---|---|
| | |
| | |
| | |

5-13
110

No̲  1409

PAY
AMOUNT *One Hundred Six Thousand, Seven Hundred Fifty 94/100* ———————— DOLLARS

| DATE | TO THE ORDER OF | CHECK AMOUNT |
|---|---|---|
| 8/2/01 | MBTA Employees Credit Union— COMEX-1892 certified | 106,750 94 |

FLEET BANK of MASSACHUSETTS, N.A.

*Victoria Hayward Schepps*

⑈001409⑈ ⑆011000138⑆ 94184  1986 2⑈

# EXHIBIT 9

## BK 18303PG069

MASSACHUSETTS DISCHARGE OF MORTGAGE REAL ESTATE (CORPORATION) 966

**MBTA EMPLOYEES CREDIT UNION** holder of a mortgage

from    RICHARD LIVINGSTON AND MARGARET LIVINGSTON

to **MBTA EMPLOYEES CREDIT UNION**

dated    APRIL 28, 1994

recorded with    NORFOLK        County Registry of Deeds

Book    12874        , Page    275        , acknowledge satisfaction of the same.

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY
*William P O'Donnell*
WILLIAM P. O'DONNELL, REGISTER

Property located at:    15 QUARRY LANE MILTON, MA 02186

*In witness whereof,* the said **MBTA EMPLOYEES CREDIT UNION**

has caused its corporation seal to be hereto affixed and these presents to be signed in its name and behalf by

### THOMAS J. HENRY, MORTGAGE MANAGER

this    24TH        day of    AUGUST        A.D. 2001



**MBTA EMPLOYEES CREDIT UNION**

Thomas J. Henry, Mortgage Manager

*The Commonwealth of Massachusetts*

*SUFFOLK*                    ss.    *AUGUST 24,*        *2001*

Then personally appeared the above-named **Thomas J. Henry, Mortgage Manager** and acknowledged the foregoing instrument to be the free act and deed of **MBTA EMPLOYEES CREDIT UNION**

before me,

A true copy from Lib. 18303 Fol. 69
In Norfolk County Registry of Deeds
Dedham, MA
Certify: *William P O'Donnell*
Register

MICHAEL J. McHARRIS
Notary Public
My Commission Expires Dec. 4, 2003

# EXHIBIT 10

07/05/06                    COMMONWEALTH OF MASSACHUSETTS                    Page 1
                            APPEALS COURT SINGLE JUSTICE

                                  2001-J-0601

                    RICHARD LIVINGSTON vs. MARGARET LIVINGSTON, A/K/A

```
  ENTRY DATE 10/22/01      CASE STATUS Disposed: Case Closed
  STATUS DATE 10/23/01     CASE NATURE GLc 231, s 118, p 1
  PETITIONER Plaintiff     SUB NATURE
     JUSTICE M             CASE TYPE Civil
 TRIAL JUDGE Kopelman D.H.    TRIAL CT Norfolk Probate & Family
TC ENTRY DATE             TC DOCKET NO 97D1237-D1        PUBLIC y
```

Richard Livingston
Pro Se Plaintiff/Petitioner
149 Warren Avenue
Milton MA 02186-2009
Phone: 617-696-4244
Active 10/22/01 Notify

Margaret Livingston, a/k/a          Eunmi Lee, Esquire
Defendant/Respondent                15 Court Square, Suite 210
Clifford                            Boston MA 02108
Active 10/22/01                     Phone: 617-624-9666
                                    641882 Active 10/22/01 Notify

Norfolk Probate and Family Court
(Lower court: Civil or General)
Office of the Register
649 High Street, P.O. Box 269
Dedham MA 02027
Phone: 617-326-7200 FAX: 617-326-5575
Active 10/22/01 Notify

                      * * *  D O C K E T  * * *
--------------------------------------------------------------------------
PAPER DATE      ENTRY
------ --------  ----------------------------------------------------------

  1.0 10/22/01 MOTION to waive entry fee, filed by Richard Livingston.

      10/22/01 RE#1: Without passing on the question of indigency, the filing
               fee is waived. (Mason, J.).

  2.0 10/22/01 PETITION purs to GLc 231, s. 118 w/attach, filed by Richard
               Livingston.

      10/23/01 RE#1 After review of the materials submitted, the petition is
               denied. (Mason, J.) Notice/Attest/Kopelman, J.

  3.0 10/25/01 Notice of appeal pursuant to MRAP, Rule 11, filed by Richard
               Livingston.

      10/26/01 RE#3 The within is struck. There is no right of appeal from an
               order of a single justice dening a petition for relief,
               pursuant to G.L.c.231, s118, from an interlocutory order of the
               trial court. See Giacobbe vs. First Coolidge Corp., 367 Mass.

07/05/06                    COMMONWEALTH OF MASSACHUSETTS                    Page 2
                            APPEALS COURT SINGLE JUSTICE

                                  2001-J-0601

              RICHARD LIVINGSTON vs. MARGARET LIVINGSTON, A/K/A


                          *  *  *   D O C K E T   *  *  *
---------------------------------------------------------------------------
PAPER DATE          ENTRY
------ --------     --------------------------------------------------------
                    309, 312-313 (1975). (Brown, J.) Notice.

  4.0 10/26/01  Motion for written findings and rulings of law, filed by
                Richard Livingston.

      10/26/01  RE#4: Denied. (Mason, J.) *Notice

  5.0 11/01/01  Copy of order re: hearing on petitioner's indigency received
                from Norfolk Probate Court.

  6.0 11/02/01  Copy of corrected order, on order of 10/30/01 received from
                Probate and Family Court - Norfolk.

APPEALS COURT
Date: 7/5/06
A true copy,
ATTEST:
Assistant Clerk

# EXHIBIT 11

United States Bankruptcy Court

District of Massachusetts

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**RICHARD LIVINGSTON,**                                  Chapter 7
Debtor                                                   Case No. 01-11602-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### ORDER

The Court has before it the Debtor's Motion for Emergency Hearing. Pursuant to

his Motion, the Debtor is requesting an emergency hearing for this Court to provide him

with "immediate assistance and guidance." The Debtor attached to his Motion numerous

exhibits, which include, but are not limited to, 1) a copy of an order issued by this Court,

dated April 24, 2001, granting the motion of Margaret Clifford, the Debtor's ex-spouse, for

relief from the automatic stay "to proceed to assert her rights against the Debtor within the

divorce proceeding between the Debtor and Clifford . . . by means [and] any means

necessary. . . ;" 2) a copy of the order granting the Debtor a discharge pursuant to 11 U.S.C.

§ 727; 3) an Affidavit of the Debtor's expenses dated October 15, 2001; 4) a "Supplement to

the Affidavit of Indigency" filed by the Debtor in the Trial Court, Probate and Family

Court Department (the "Probate Court"), dated October 23, 2001; 5) a copy of a W-2 Form

for 2000, showing that the Debtor received wages and other compensation totaling

$21,1191.11; 6) a copy of the Debtor's Schedule I-Current Income of Individual Debtor,

showing total monthly income of $1,133.08; 5) a copy of a Motion filed by Margaret

1

Certified to be a true and
correct copy of the original
James M. Lynch, Clerk
U.S. Bankruptcy Court
District of Massachusetts
By: _Maureen Mattus_
Deputy Clerk
Date: _July 11, 2006_

DOCKETED

Clifford in the Probate Court for Contempt Sanction, in which she sought a "a conveyance of [the] marital home as [a] sanction for Richard Livingston's . . . past bad deeds and his willful attempts to circumvent probate court orders;" and 6) a copy of a Motion for Tempory [sic] Orders filed by Richard Livingston on or around August 2, 2001 in the Probate Court in which he sought to "modify the Child Support payments made by the Plaintiff [the Debtor] so that they are in accordance with applicable Child Support guidelines and his ability to pay," which motion was scheduled to be heard in the Probate Court on October 25, 2001.

As is evident from his Motion, the Debtor is seeking relief from orders entered by the Probate Court, which he refers to as the "lower court." He states the following:

> The Child Support Guidelines were not utilized, nor were the resources of the custodial parent factored into the formula that should have been used. This exorbitant sum, now identified in the lower court as child support does not meet the law of the Commonwealth, or public policy, and continues to exacerbate the debtor's insolvency relegating him to the status of indigence, as recognized under Massachusetts chapter 261, Section 27D, because he is unable to provide the necessities of life for himself, such as food, shelter, and clothing. If the Bankruptcy Court does not redress this matter the Debtor will be in a perpetual state of servitude and insolvency . . . .

Debtor's Motion for Emergency Hearing at p. 3

Upon consideration of the Debtor's Motion for Emergency Hearing and the documents attached to it, as well as the record of proceedings in this case, including 1) the order granting Margaret Clifford relief from the automatic stay; 2) the entry of the discharge order on July 26, 2001; 3) the filing of a Report of No Assets by the Chapter 7 Trustee on October 26, 2001; and 4) the request for an advisory opinion and/or reversal

2

or modification of the orders of the Probate Court, the Court hereby denies the Debtor's

Motion for Emergency Hearing as the relief requested by the Debtor is barred by the

Rooker-Feldman Doctrine.[1]    The Debtor's remedy, if one exists, is an appeal from the

---

[1]  In <u>Halvosen v. Mendez (In re Mendez)</u>, 246 B.R. 141 (Bankr. D. P.R. 2000), the
United States Bankruptcy Court for the District of Puerto Rico succinctly explained the
Rooker-Feldman Doctrine as follows:

> The Rooker-Feldman doctrine traces its origins to two U.S.
> Supreme Court cases, <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 44 S.Ct.
> 149, 68 L.Ed. 362 (1923), and <u>District of Columbia Court of Appeals v.
> Feldman</u>, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). This doctrine
> recognizes that U.S. district courts are courts of original, not appellate
> jurisdiction. Thus, "lower federal courts are without subject matter
> jurisdiction to sit in direct review of state court decisions".  <u>Wang v. New
> Hampshire Board of Registration in Medicine</u>, 55 F.3d 698, 703 (1st
> Cir.1995); <u>Hill v. Town of Conway</u>, 193 F.3d 33 (1st Cir.1999).
>     'Even if jurisdiction would otherwise exist under 28 U.S.C. § 1334
> over a given dispute, a bankruptcy court may not exercise jurisdiction
> over that dispute if, by so doing, it would be granting federal review of a
> state court determination or of an issue that is 'inextricably intertwined'
> with a state court judgment.' Bluebond, Sheri, Recent Developments in
> Jurisdiction, Venue, Abstention, Remand, Removal, Withdrawal of the
> Reference, Jury Trials and Appeals, 767 PLI/Comm. 9 (1998).
>     In <u>Snider v. City of Excelsior Springs, Missouri</u>, 154 F.3d 809,
> 811-812 (8th Cir.1998), the court explained:

>> Rooker-Feldman precludes a federal action if the relief
>> requested in the federal action would effectively reverse the
>> state court decision or void its holding. [cit. omitted]
>> *Deciding whether Rooker-Feldman bars the plaintiffs' federal suit*
>> *therefore requires that we determine what the state court held and*
>> *whether the relief that the plaintiffs requested in their federal*
>> *action would void the state court's decision or would require us to*
>> *determine that the decision was wrong.*

> (Emphasis added.)

246 B.R.  at 145-46.

3

orders of the Probate Court.

By the Court,

*Joan N. Feeney*
Joan N. Feeney
United States Bankruptcy Judge

Dated: November 6, 2001
cc: Richard Livingston, William E. Gately, Jr., Esq., Joseph G. Butler, Esq., Eunmi Lee, Esq.

4

**EXHIBIT 12**

```
**************************************************
***  THIS CASE CONTAINS IMPOUNDED MATERIAL  ***
**************************************************
```

07/05/06                    COMMONWEALTH OF MASSACHUSETTS                    Page 1
                            APPEALS COURT SINGLE JUSTICE

                                 2002-J-0426

                   RICHARD LIVINGSTON vs. MARGARET LIVINGSTON

---

```
     ENTRY DATE 07/26/02      CASE STATUS Disposed: Case Closed
    STATUS DATE 08/02/02      CASE NATURE Indigency appeal 261/27D
     PETITIONER Plaintiff      SUB NATURE
        JUSTICE K               CASE TYPE Civil
    TRIAL JUDGE Kopelman D.H.    TRIAL CT Norfolk Probate & Family
 TC ENTRY DATE               TC DOCKET NO 97D1237D1        PUBLIC p
```

---

                           Additional Information

Note: ***Financial Statements, Guardian Ad Litem Report & Indigency filings
are impounded***

---

Richard Livingston
Plaintiff/Petitioner
149 Warren Avenue
Milton MA 02186-2009
Phone: 617-698-4333
Active 07/26/02 Notify

Margaret Livingston                    Eunmi Lee, Esquire
Defendant/Respondent                   15 Court Square, Suite 210
a/k/a Margaret Clifford                Boston MA 02108
Active 07/26/02                        Phone: 617-624-9666
                                       641882 Active 07/26/02 Notify

Norfolk Probate and Family Court
(Lower court: Civil or General)
Office of the Register
649 High Street, P.O. Box 269
Dedham MA 02027
Phone: 617-326-7200 FAX: 617-326-5575
Active 07/26/02

                        * * *  D O C K E T  * * *
-----------------------------------------------------------------------------
PAPER DATE        ENTRY
------ --------   ----------------------------------------------------------

        07/26/02 Prior A.C. cases involving same parties: 2001-J-0601.

1.0 07/26/02 Appeal entered purs to G.L.c. 261, s.27(D) w/attach.

2.0 07/29/02 ORDER: "... the Superior Court's denial of .. plaintiff's
             motion ... pursuant to G.L. 261, S27c, is affirmed." (Kass, J.)
             Notice/Attest/Kopelman, J./Image

```
*************************************************
***  THIS CASE CONTAINS IMPOUNDED MATERIAL  ***
*************************************************
```

07/05/06               COMMONWEALTH OF MASSACHUSETTS                    Page 2
                        APPEALS COURT SINGLE JUSTICE

                               2002-J-0426

                RICHARD LIVINGSTON vs. MARGARET LIVINGSTON


                         * * *   D O C K E T   * * *
------------------------------------------------------------------------
PAPER DATE      ENTRY
------ -------- --------------------------------------------------------
 3.0 07/30/02 AMENDED ORDER: "...the Probate and Family Court judge's denial
              of...plaintiff's motion...pursuant to G. L. 261, S 27C, is
              affirmed." (Kass, J.) *Notice/Attest/Kopelman, J./Image.

 4.0 08/02/02 Letter from Richard Livingston re: filing and the assembly of
              record received on 7/25/02 from the Norfolk Probate & Family
              Court.

     08/02/02 RE#4 The trial court has indicated that, in due course, it will
              issue a notice of assembly of record of appeal which includes
              Mr. Livingston's "violation of due process" appeal. *Notice.
```

APPEALS COURT

Date: 7/5/06

A true copy,
ATTEST: _____
              Assistant Clerk

# EXHIBIT 13

```
*************************************************
***  THIS CASE CONTAINS IMPOUNDED MATERIAL  ***
*************************************************
```

07/05/06                  COMMONWEALTH OF MASSACHUSETTS                    Page 1
                                APPEALS COURT

                                 2002-P-1164

                   RICHARD LIVINGSTON vs. MARGARET LIVINGSTON

```
┌────────────────────────────────────────────────────────────────────────────┐
│  ENTRY DATE 08/26/02      CASE STATUS Closed: Rescript issued                │
│  STATUS DATE 01/08/04     CASE NATURE Domestic Relation/Divorce              │
│  APPELLANT P                SUB NATURE Pro se, modification                  │
│  READY DATE             ARGUED/SUBMTD 10/29/03                               │
│         PANEL LK GR CW          DECIDED 12/11/03              PUBLIC p        │
│  DISPOSITION              OPINION TYPE 1:28          CASE TYPE Civil         │
│  TRIAL JUDGE Kopelman D.H.    TRIAL CT Norfolk Probate & Family              │
│ TC ENTRY DATE 10/31/97   TC DOCKET NO 97D-1237-D1                           │
│  SJ DOCKET NO               CITATION 60   Mass. App. Ct. 1107               │
└────────────────────────────────────────────────────────────────────────────┘
```

Richard Livingston
Pro Se Plaintiff/Appellant
149 Warren Avenue
Milton MA 02186-2009
Phone: 617-698-4333
Blue brief & appendix filed
Active 08/26/02 Notify

Margaret Livingston                    Eunmi Lee, Esquire
Defendant/Appellee                     15 Court Square, Suite 210
aka Margaret Clifford                  Boston MA 02108
Awaiting red brief                     Phone: 617-624-9666
next br. due 11/29/02                  641882 Active 08/26/02 Notify
Active 08/26/02

Norfolk Probate and Family Court
(Lower Court: Civil or General)
Office of the Register
649 High Street, P.O. Box 269
Dedham MA 02027
Phone: 617-326-7200 FAX: 617-326-5575
Active 08/26/02

--------------------------------------------------------------------------------
                         * * *  D O C K E T  * * *
--------------------------------------------------------------------------------
PAPER DATE     ENTRY
------ -------- ----------------------------------------------------------------

       08/26/02 Prior A.C. cases involving same parties: 2001-J-0601,
                2002-J-0426.

       10/29/02 ****** Appellant's brief impounded ******

 1.0   08/26/02 Entered.

 2.0   08/26/02 Notice of Appeal, Application for Direct Appellate Review,
                filed by Richard Livingston.

```
**************************************************
***   THIS CASE CONTAINS IMPOUNDED MATERIAL   ***
**************************************************
```

07/05/06                COMMONWEALTH OF MASSACHUSETTS                Page 2
                             APPEALS COURT

                             2002-P-1164

            RICHARD LIVINGSTON vs. MARGARET LIVINGSTON


                       * * *  D O C K E T  * * *
---------------------------------------------------------------------------
PAPER DATE        ENTRY
------ --------   --------
       08/26/02 RE#2 To the exent the within is intended to be an application
                for direct appellate review, the appellant is advised that, in
                accordance with Mass.R.A.P. 11, the original and 17 copies must
                be filed with the Supreme Judicial Court and one copy is to be
                filed with the Appeals Court. Accordingly, no action will be
                taken on the within by this Court. *Notice.

       09/09/02 Copy of DAR application of Richard Livingston.

  3.0  10/07/02 Letter from the Appeals Court to Richard Livingston re:
                nonconforming brief.

  4.0  10/09/02 Motion to file non-conforming brief filed by Richard
                Livingston.

       10/10/02 RE#4: Denied. The appellant is to file a brief and appendix
                that conforms to MRAP 16 and 18 the Clerk's Office letter dated
                10/07/02. Further, only documents that were filed in the trial
                court as part of the proceeding at issue on appeal are part of
                the record on appeal, and any other documents must be omitted
                from the record appedix. Corrected brief and record appendix to
                be filed on or before 10/30/02. (Laurence, J.) *Notice.

  5.0  10/28/02 Notice of Reference to Impounded Material Rule 16(m) included
                in brief, filed by Richard Livingston.

  6.0  10/29/02 SERVICE of brief & appendix for Plaintiff/Appellant Richard
                Livingston.

       11/04/02 DAR DENIED (on 10/30/02).

  7.0  11/22/02 Notice of Errata to brief filed by Richard Livingston.

       10/28/03 Placed on November non-argument list.

       10/29/03 Under consideration by Panel. (LK GR CW).

  8.0  12/11/03 Decision: Rule 1:28 (LK GR CW). Judgments affirmed. *Notice.
                (See image on file)

       01/08/04 RESCRIPT to Trial Court.
```

APPEALS COURT
Date: 7/5/06
A true copy,
ATTEST: _____
Assistant Clerk

# EXHIBIT 14

07/05/06                 COMMONWEALTH OF MASSACHUSETTS                    Page 1
                            SUPREME JUDICIAL COURT
                            FOR THE COMMONWEALTH

                                 DAR-12889

                RICHARD LIVINGSTON vs. MARGARET LIVINGSTON

```
┌────────────────────────────────────────────────────────────────────────┐
│     ENTRY DATE 09/09/02        CASE STATUS DAR denied                    │
│     STATUS DATE 10/30/02             NATURE Domestic Relation/Divorce    │
│  AC DOCKET NO 2002-P-1164     AC ENT/RESC 08/26/02          CLERK DL      │
│     APPELLANT P                   APPLICANT P              CV/CR CV       │
│     LEAD CASE                      RELATION            OPPOSE 09/19/02    │
│  FC DOCKET NO                      CITATION    Mass.                      │
│   TRIAL JUDGE Kopelman D.H.        TRIAL CT Norfolk Probate & Family      │
│  TC ENTRY DATE 10/31/97       TC DOCKET NO 97D-1237-D1      PUBLIC y      │
└────────────────────────────────────────────────────────────────────────┘
```

Richard Livingston
Pro Se Plaintiff/Appellant
149 Warren Avenue
Milton MA 02186-2009
Phone: 617-698-4333
Active 08/26/02 Notify

Margaret Livingston                Eunmi Lee, Esquire
Defendant/Appellee                 15 Court Square, Suite 210
A.K.A. Margaret Clifford           Boston MA 02108
Active 08/26/02                    Phone: 617-624-9666
                                   641882 Active 08/26/02 Notify

Norfolk Probate and Family Court
(Lower Court: civil or general)
Office of the Register
649 High Street, P.O. Box 269
Dedham MA 02027
Phone: 781-326-7200
Active 08/26/02

                    * * *  D O C K E T  * * *
--------------------------------------------------------------------------------
PAPER DATE        ENTRY
------ --------   ----------
        09/09/02 Docket opened.

  1.0  09/09/02 DAR APPLICATION of Richard Livingston filed by Richard
                Livingston, Pro se.

  2.0  10/30/02 DENIAL of DAR application.

                               A true copy.

                                         Attest:

                           Aug 5, 2006
                             Date              Ass't Clerk

# EXHIBIT 15

Westlaw.

800 N.E.2d 346

Page 1

60 Mass.App.Ct. 1107, 800 N.E.2d 346, 2003 WL 22928524 (Mass.App.Ct.)
**(Cite as: 60 Mass.App.Ct. 1107, 800 N.E.2d 346)**

Briefs and Other Related Documents
NOTICE: THIS IS AN UNPUBLISHED
OPINION.
Appeals Court of Massachusetts.
Margaret **LIVINGSTON,**
v.
Richard **LIVINGSTON.**
No. 02-P-1164.

Dec. 11, 2003.

*MEMORANDUM AND ORDER PURSUANT TO
RULE 1:28*

*1 The defendant, who is pro se, appeals from a
judgment of dismissal of a complaint for contempt,
docketed on September 20, 2001 (A.101), from a
judgment dismissing his complaint for modification,
docketed on January 16, 2002 (A.103), and from an
additional temporary order on the latter complaint
(A.103-104). In his appellate brief, the defendant
devotes much argument to alleged improprieties in
an order, or orders, denying him indigent status and
relief under G.L. c. 261, §§ 27C and 27D. Appeal
of such matters is to the single justice, and the
decision of the single justice is final under G.L. c.
261, § 27D. See *Im v. Commonwealth,* 432 Mass.
1018, 1019 (2000). The defendant has had single
justice review of these matters, although he was
unsuccessful.[FN1]

> FN1. In A.C. No. 01-J-601, the husband
> sought relief under G.L. c. 231, § 118, first
> par., but the single justice denied his
> petition by order dated October 23, 2001.
> More recently, the husband properly
> appealed to the single justice under G.L. c.
> 261, § 27D (A.C. No. 02-J-426), but the
> single justice by order dated July 30, 2002,
> affirmed the Superior Court order denying
> the husband's motion under G.L. c. 261, §

27C. Any rulings by the Superior Court
respecting the husband's claim of indigent
status, and the judge's findings on that
issue (A.106-110) to which the husband
refers, are not before the court on this
appeal.

While the defendant appears to offer argument as to
his entitlement to a modification, he has produced
in the record appendix only the one-page judgment
appealed from (A.46, 111), without the parties'
stipulation that was incorporated into the judgment,
or any of the record evidence submitted below.
Accordingly, the appellate record is insufficient to
admit of this court's review. See *Brossard v. West
Roxbury Div. of the Dist. Ct. Dept.,* 417 Mass. 183,
184 (1994). It is the responsibility of the parties to
include materials necessary to the appeal, including
exhibits, in the appendix under Mass.R.A.P. 18(a),
(b), as amended, 425 Mass. 1602 (1997). See
*Guardianship of Brandon,* 424 Mass. 482, 497 n.
22 (1997); *Cameron v. Carelli,* 39 Mass.App.Ct.
81, 84 n. 6 (1995).

Finally, the defendant contests the provision
contained in the judgment of modification that "
[n]either party shall be permitted to file any further
complaints for modification without first obtaining
leave of this Court." (A.46, 111). The record is also
insufficient to admit of review of this ruling, which,
in any event, was within the authority of the Probate
Court. See *Gorod v. Tabachnick,* 428 Mass. 1001,
1002, cert. denied, 523 U.S. 1003 (1998).
*Judgments affirmed.*

Mass.App.Ct.,2003.
Livingston v. Livingston
60 Mass.App.Ct. 1107, 800 N.E.2d 346, 2003 WL
22928524 (Mass.App.Ct.)

Briefs and Other Related Documents (Back to top)

• 2002-P-1164 (Docket) (Aug. 26, 2002)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

800 N.E.2d 346

60 Mass.App.Ct. 1107, 800 N.E.2d 346, 2003 WL 22928524 (Mass.App.Ct.)
**(Cite as: 60 Mass.App.Ct. 1107, 800 N.E.2d 346)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 16**

# COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, SS**

**Stoughton District Court**
CIVIL NO.

*8455 CV 53*

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**RICHARD LIVINGSTON**     \*
     **Plaintiff**      \*
          \*
     **v.**      \*
         
**VICTORIA SCHEPPS**     \*
     **Defendant**      \*
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

```
5544A000001/26/04CIVIL      130.0
5544A000001/26/04SURCHARGE   15.0
5544A000001/26/04COPY-WRIT    5.0
```

**Now comes the Plaintiff Richard Livingston and alleges the following:**

### I.  *The Parties*

1.  **The Plaintiff, Richard Livingston is a resident of Milton, Massachusetts, County of Norfolk, Commonwealth of Massachusetts**

2.  **The Defendant, Victoria Schepps has a usual place of business in Stoughton, Commonwealth of Massachusetts**

### II  *Allegations*

3.  **On or about July, 2001 and all relevant times thereafter and before the Plaintiff was one of two owners of a property located at 15 Quarry Lane, Milton, Massachusetts.**

4.  **On or about July of 2001 the Defendant was the closing attorney in connection with a new mortgage placed on the property by Margaret Clifford.**

5.  **On or about July 2001 a closing took place at which time the closing proceeded without notice to the Plaintiff.**

6.  **On or about July 2001 and all relevant times thereafter Defendant has failed to obtain and file discharges on the property**



I CERTIFY THAT THIS IS A TRUE COPY UNDER MY HAND AND SEAL THIS __ DAY OF ____ 20__
MAGISTRATE / CLERK

JAN 2 3 2004

7.   On or about July 2001 and relevant times thereafter the Defendant
     has failed to comply with other statutory duties in connection with
     the closing.

8.   As a direct and proximate result the Defendant has impaired the
     Plaintiff's value in the property.

9.   As a direct and proximate result thereof the Defendant has caused
     the Plaintiff to incur intentional emotional distress.

Wherefore the Plaintiff demands judgment against the Defendant I an amount to be
determined by a Judge and/or Jury.

                              By
                              Richard Livingston
                              Plaintiff,
                              By his Attorney,


                              William E. Gately, Jr., Esquire
                              Law Offices of William E. Gately, Jr.
                              400 Washington Street
                              P.O. Box 850920
                              Braintree, MA  02184
                              TEL.#:  (781) 848-1200
                              BBO#:  549132

Dated:   1/19/0c

          THE PLAINTIFF DEMANDS A TRIAL BY JURY

JAN 2 3 2004

**EXHIBIT 17**

| | | TIME STANDARDS TRIAL REQUEST DEADLINE | DOCKET NUMBER |
|---|---|---|---|

**Trial Court of Massachusetts**
**District Court Department**

| | DATE FILED | TIME STANDARDS TRIAL REQUEST DEADLINE | DOCKET NUMBER |
|---|---|---|---|
| | 1/23/04 | | 0455CV 53 |

| PLAINTIFF | DEFENDANT |
|---|---|
| Richard Livingston | Victoria Schepps |

Stoughton District Court
1288 Central Street
Stoughton, MA. 02072

| PLAINTIFF ATTORNEY | DEFENDANT ATTORNEY |
|---|---|
| William E. Gately, Jr.<br>400 Washington St.<br>PO BOX 850920<br>Braintree, MA 02184<br>781-848-1200 | George C. Rockas, Esq.<br>Wilson,Elser,Moskowitz,<br>Edelman & Dicker, LLP<br>155 Federal St,5th fl.<br>Boston, Ma. 02110 |

MONEY DAMAGE ACTION (TIME STANDARDS)
☐ Remand   XX ☐ District Court Filing

☐ SUMMARY PROCESS   ☐ VICTIM VIOLENT CRIME   X☐ OTHER CIVIL   Contract

| NO. | DATE | DOCKET ENTRIES |
|---|---|---|
| 1. | 1/23/04 | Complaint filed   XX ☐ Statement of damages filed (if applicable) |
| 2. | 3/1/04 | Summons served 2/19/04 in hand to Victoria Schepps |
| 3 | 3/10/04 | Answer of Defendant |
| 4 | 4-13-04 | NOTICE OF CASE MANAGEMENT CONFERENCE FOR 6-15-04 10AM SENT |
| 5 | 10/26/04 | Notice of Pre Trial on 10/26/04 at 10:00 a.m. |

(date) *9-15-04* Case entered
into BasCOT system.

I HEREBY CERTIFY THAT THIS IS A TRUE
COPY, GIVEN UNDER MY HAND AND SEAL
THIS ___ DAY OF ___ 200*6*

CLERK MAGISTRATE
ASSISTANT CLERK

| DATE OF ENTRY OF JUDGMENT | ☐ CIVIL | ☐ SUMMARY PROCESS |
|---|---|---|

☐ Judgment for _____.

☐ $ _____ damages, plus $ _____ prejudgment interest and $ _____ costs
plus $ _____ interest from date of judgment entry to date of execution

☐ Possession

| JUDGMENT TOTAL |
|---|
| $ |
| EXECUTION TOTAL |
| $ |

☐ Judgment on defendant's counterclaim for _____
☐ $ _____ damages, plus $ _____ prejudgment interest and $ _____ costs
plus $ _____ interest from date of judgment entry to date of execution

| COUNTERCLAIM JUDGMENT TOTAL |
|---|
| $ |
| COUNTERCLAIM EXECUTION TOTAL |

| Civil **DOCKET** | DOCKET NUMBER **200455CV000053** | Trial Court of Massachusetts District Court Department |
|---|---|---|

| CASE NAME **RICHARD LIVINGSTON vs. VICTORIA SCHEPPS** | CURRENT COURT Stoughton District Court 1288 Central St. Stoughton, MA 02072-4419 (781) 344-2131 |
|---|---|

| ASSOCIATED DOCKET NO. | DATE FILED 01/23/2004 | DATE DISPOSED 03/15/2005 | |
|---|---|---|---|

| PLAINTIFF(S) P01  RICHARD LIVINGSTON | PLAINTIFF'S ATTORNEY WILLIAM E. GATELY, Jr 400 WASHINGTON STREET P. O. BOX 850920 BRAINTREE, MA 02185 (781) 848-1200 |
|---|---|

| DEFENDANT(S)/OTHER SINGLE PARTIES D01  VICTORIA SCHEPPS 6 CABOT PLACE STOUGHTON, MA 02072 | DEFENDANT'S ATTORNEY GEORGE C. ROCKAS & DICKER, LLP 155 FEDERAL STREET BOSTON, MA 02110 (617) 422-5300 |
|---|---|

| NO. | ENTRY DATE | DOCKET ENTRIES |
|---|---|---|
| 1 | 09/15/2004 | Case added to BasCOT computer system at Stoughton District Court; see earlier manual docket for prior docket entries. |
| 2 | 09/15/2004 | Appearance for Richard Livingston filed by Attorney WILLIAM E. GATELY, Jr 400 Washington Street P. O. Box 850920 Braintree MA 02185 BBO# 549132 |
| 3 | 09/15/2004 | Appearance for Victoria Schepps filed by Attorney GEORGE C. ROCKAS & Dicker, Llp 155 Federal Street Boston MA 02110 BBO# 544009 |
| 4 | 09/15/2004 | PRETRIAL CONFERENCE SCHEDULED for 10/26/2004 10:00 AM. |
| 5 | 10/26/2004 | PRETRIAL CONFERENCE SCHEDULED on 10/26/04 10:00 AM RESCHEDULED for 1/25/05 10:00 AM. Reason: Request of all parties. |
| 6 | 10/26/2004 | Notice of pretrial conference sent to parties. |
| 7 | 10/26/2004 | Memorandum filed by P01  RICHARD LIVINGSTON.   Joint Pre Trial Memo Filed. |

| Page 1 of 3 | A TRUE COPY, ATTEST: | CLERK-MAGISTRATE/ASST. CLERK **X** | | DATE |
|---|---|---|---|---|

Date/Time Printed: 07/06/2006 09:35 AM

| DOCKET CONTINUATION | DOCKET NUMBER<br>200455CV000053 |
|---|---|

| NO. | ENTRY DATE | DOCKET ENTRIES |
|---|---|---|
| 28 | 02/10/2005 | MOTION SCHEDULED FOR HEARING on 02/10/2005 10:00 AM. |
| 29 | 02/17/2005 | Motion to Reconsider Motion to Quash filed by P01  RICHARD LIVINGSTON. |
| 30 | 02/17/2005 | Opposition of Plaintiff Richard livingston to Margaret Clifford's Motion to Quash  FILED |
| 31 | 02/17/2005 | Memorandum filed by P01  RICHARD LIVINGSTON. |
| 32 | 02/18/2005 | Notice sent to parties. |
| 33 | 02/23/2005 | MOTION SCHEDULED on 2/24/05 10:00 AM RESCHEDULED for 3/10/05 10:00 AM. Reason: Request of all parties. |
| 34 | 03/14/2005 | Opposition filed by P01  RICHARD LIVINGSTON to Motion for judgment on the pleadings (Mass.R.Civ.P. 12[c]) that was filed on 01/04/2005. |
| 35 | 03/15/2005 | Notice sent to parties. |
| 36 | 03/15/2005 | PRETRIAL CONFERENCE SCHEDULED on 4/21/05 CANCELED. Reason: Other. |
| 37 | 03/15/2005 | Case Inactivated: No future events scheduled. |
| 38 | 03/15/2005 | Judgment of dismissal of claim of P01 RICHARD LIVINGSTON against D01 VICTORIA SCHEPPS upon motion ( Crimmins, Jr., Hon. Francis T. ); parties notified. |
| 39 | 04/11/2005 | Motion for reconsideration,to vacate judgment and to amend complaint filed by P01  RICHARD LIVINGSTON.  Denied after hearing  4/28/05 |
| 40 | 04/11/2005 | MOTION SCHEDULED FOR HEARING on 04/14/2005 10:00 AM. |
| 41 | 04/13/2005 | MOTION SCHEDULED on 4/14/05 10:00 AM RESCHEDULED for 4/21/05 10:00 AM. Reason: Request of all parties. |
| 42 | 04/21/2005 | MOTION SCHEDULED on 4/21/05 10:00 AM RESCHEDULED for 4/28/05 10:00 AM. Reason: Other. |
| 43 | 04/21/2005 | Notice of next event sent to parties. |
| 44 | 04/28/2005 | Opposition filed by D01  VICTORIA SCHEPPS to Motion Reconsideration, vacate judgment & Amend that was filed on 04/11/2005. |
| 45 | 04/28/2005 | Case Inactivated: Judgment of dismissal has been entered. |
| 46 | 04/28/2005 | Notice sent to parties. |

| Page 3 of 3 | A TRUE COPY,<br>ATTEST: | CLERK-MAGISTRATE/ASST. CLERK<br>X | DATE |
|---|---|---|---|

Date/Time Printed:  07/06/2006 09:35 AM

| DOCKET CONTINUATION | DOCKET NUMBER |
| --- | --- |
| | 200455CV000053 |

| NO. | ENTRY DATE | DOCKET ENTRIES |
| --- | --- | --- |
| 8 | 12/03/2004 | PRETRIAL CONFERENCE SCHEDULED on 1/25/05 10:00 AM RESCHEDULED for 1/20/05 02:00 PM. Reason: Other. (New Court schedule.) |
| 9 | 01/10/2005 | Motion for judgment on the pleadings (Mass.R.Civ.P. 12[c]) filed by D01 VICTORIA SCHEPPS. ALLOWED AFTER HEARING 03/10/05 |
| 10 | 01/10/2005 | Memorandum filed by D01 VICTORIA SCHEPPS. |
| 11 | 01/10/2005 | MOTION SCHEDULED FOR HEARING on 01/20/2005 10:00 AM. |
| 12 | 01/10/2005 | Notice of next event sent to parties. |
| 13 | 01/19/2005 | MOTION SCHEDULED on 1/20/05 10:00 AM RESCHEDULED for 2/17/05 10:00 AM. Reason: Request of all parties. continued to 2/24/05. Notice sent. |
| 14 | 01/19/2005 | Motion Joint Motion to continue Pre Trial filed by P01 RICHARD LIVINGSTON. 1/19/05 ALLOWED. |
| 15 | 01/19/2005 | PRETRIAL CONFERENCE SCHEDULED for 04/21/2005 09:00 AM. |
| 16 | 01/19/2005 | Notice of pretrial conference sent to parties. |
| 17 | 01/28/2005 | Motion to Compel Witness to attend Depositions filed by P01 RICHARD LIVINGSTON.        designee of RAH Federal Credit Union ALLOWED after hearing |
| 18 | 01/28/2005 | Motion to Compel Witness to Attend Depositions filed by P01 RICHARD LIVINGSTON.        designee of MBTA Employee Credit Union   OFF LIST 2/3/05 |
| 19 | 01/28/2005 | Motion to Compel Witness to Attend Depositions filed by P01 RICHARD LIVINGSTON.        Keeper of the Records Cumex ALLOWED after hearing |
| 20 | 01/28/2005 | MOTIONS SCHEDULED FOR HEARING on 02/03/2005 10:00 AM. |
| 21 | 02/02/2005 | Opposition filed by Atty. Gary Kravetz MBTA Employees Credit Union to Motion to compel witness to attend Depositions that was filed on 01/19/2005. |
| 22 | 02/02/2005 | Affidavit of RUTH EPPS filed. |
| 23 | 02/02/2005 | Affidavit of GARY J KRAVETZ filed. |
| 24 | 02/04/2005 | Faxed letter and a mailed letter from Atty. Gary Kravetz |
| 25 | 02/04/2005 | MOTION SCHEDULED on 2/3/05 10:00 AM RESCHEDULED for 2/24/05 10:00 AM. Reason: Request of all parties. |
| 26 | 02/04/2005 | Notice of next event sent to parties. |
| 27 | 02/10/2005 | Ex parte motion to quash suboena issued & for protect. order filed by MARGARET CLIFFORD. AFTER ARGUEMENT FOR MRS. CLIFFORD, MOTION ALLOWED 2/10/05 PROPOSED ORDER filed in case. |

| | A TRUE COPY, ATTEST: | CLERK-MAGISTRATE/ASST. CLERK | | DATE |
| --- | --- | --- | --- | --- |
| Page 2 of 3 | | X | | |

# EXHIBIT 18

# BY-LAWS

## April, 2005



### MISSION STATEMENT

The purpose of the MBTA Employees Credit Union is to satisfy all of the financial needs of our members with responsive, high quality services provided by a highly motivated professional staff while providing the Credit Union with an acceptable return for these services.



# BY-LAWS

### ARTICLE I
### Name and Object

**Section 1.** This corporation shall be known as the MBTA Employees Credit Union.

**Section 2.** The object of this Credit Union is wholly cooperative, being organized solely for the promotion of thrift among members by the accumulation of their savings in small amounts and the loaning of such accumulation to its members only for provident purposes at a moderate rate of interest.

### ARTICLE II
### Membership and Sphere of Operation

**Section 1.** Membership in this corporation is limited to those who are employed by the MBTA, former employees of the MBTA who have accounts in good standing with the Credit Union at the time of their voluntary separation from the MBTA or whose application for continued membership in the Credit Union following termination of employment at the MBTA for any other reason has been approved by the Board of Directors and personnel employed by organizations operated wholly by and for such employees, including retired employees, widow and widowers and the immediate families of such members defined as spouse, parents, children and sibling by direct lineage. Persons not so eligible for membership may have joint accounts with members of the Credit Union for the purpose of Deposits and withdrawals only when permitted by the Board of Directors.

Membership shall also be available to (i) employees (and their immediate family members, as defined above) of companies affiliated with the MBTA, (ii) employees (and their immediate family members, as defined above) of companies that are unaffiliated with the MBTA who are members of labor union locals which also represent MBTA employees and have bargaining agreements with the MBTA and (iii) individuals who live, work or belong to a religious organization, social organization or labor organization located within Census Blocks 605, 606, 607, 608, 611, 612 and 907 in the State of Massachusetts, County of Suffolk, as defined in the 2000 Census published by the United States Census Bureau and as said Census Blocks may be redefined by the United States Census Bureau from time to time. An affiliate for these purposes is a company controlling, controlled by or under common control with the MBTA. "Control" has the meaning set forth in Chapter 172, Section 26A of the General Laws of Massachusetts as in existence on the date of adoption of this paragraph. For the purposes of clause (iii) above, "Religious Organization" shall mean any organization which has received a favorable determination letter as an entity organized and Operated exclusively for religious purposes from the Internal Revenue Service ("IRS") under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), "Social Organization" shall mean any organization which has received a favorable determination letter from the IRS under Section 501(c) (4), (6), (7), (8), (10) or (19) of the Code and "Labor Organization " shall mean any labor union local registered with the Office of Labor Management Standards of the U.S. Department of Labor (or any agency of the Federal Government charged with such regulatory authority subsequent to the date of adoption of this paragraph) or with any comparable state agency."

**Section 2.** Applications for membership must be made in writing, and each must bear the approval of a member of the Board of Directors or their designee being presented by him/her to the board for action at a regular meeting. No Director shall present the name of a person whom he can not recommend as being honest, industrious and of good habits. No former member may apply for new membership if he/she has filed for bankruptcy and included the Credit Union in his/her petition.

**Section 3.** A person admitted to membership by the Board of Directors shall not become a member until he/she has qualified by subscribing and paying in full for at least one (1) share of capital.

**Section 4.** No member may resign while a borrower, an endorser or a guarantor on any loan due the Credit Union.

**Section 5.** A member who is discharged from the MBTA for cause may apply to the Board of Directors to remain a member of the Credit Union. If such an application is not submitted or is denied by the Board of Directors in its sole discretion, the member must withdraw his/her shares after the monthly dividend postings. A member who voluntarily resigns from the MBTA, withdraws from the MBTA Employees Credit Union or stops participating in the MBTA Retirement Fund may withdraw his/her shares after the same dividend dates. A member who voluntarily resigns from the MBTA or stops participating in the MBTA Retirement Fund may  remain a member of the Credit Union. Members who retain their shares may make proper application for loans, subject to approval of the Credit Committee and loan officers. The amounts paid in on shares or deposited by members who have withdrawn or have been expelled in accordance with provisions of law from the Credit Union shall be paid to them, in order of withdrawal or expulsion, but only as funds therefore become available and after deducting any amounts due from such members to the Credit Union. Such

withdrawal or expulsion shall not operate to relieve a member from any outstanding liability to the Credit Union. Retired members applying for such loans shall be required to sign MBTA Retirement Board Authorization to deduct each month from retirement benefit payments, the monthly payments required for repayment of the loan. It shall be the duty of the Treasurer to expel any member who has caused the Credit Union to sustain a loss on his/her loan. In addition, expel any member who creates a loss to the Credit Union on their share account or any other deposit account with the Credit Union. The Treasurer may allow the member to maintain a share account only for the sole purpose of making payments to any loss sustained. If the member fully repays the Credit Union, the Treasurer may consider him/her for reinstatement.

**Section 6.** The Officers, Directors, Members of Committees and Employees of this Credit Union must hold in confidence all transactions, confidences, reports, and other information regarding the Credit Union and its members respecting their personal affairs, except when required by State or Federal Law.

**Section 7.** Honorary membership for ex-directors to the Board of Directors may be created at the discretion of the Board of Directors for a Director who has had long service as a member of the Board. This section not to become effective or retroactive prior to November 17, 1975. Any honorary ex-director shall be recognized and allowed to speak, but shall not have a vote in the conduct of the business

**Section 8.** No member shall harass any Director, Officer or Employee in any manner or engage in any other conduct that harms or threatens the safety or welfare of Directors, Officers or Employees or interferes with the safe and sound operation of the Credit Union. A violation of this section shall be grounds for expulsion from the Credit Union.

## ARTICLE III
### Capital and Liability

**Section 1.** Shares may be subscribed to and paid in any amount subject to statutory limitations and regulations of the Board of Directors.

**Section 2.** Shares may be transferred from one member to another only in such form as the Board of Directors may approve.

**Section 3.** Shares in the Credit Union may be withdrawn by any means voted upon and approved by a majority vote of the Board of Directors and on any day which the Credit Union is open for business, but the Board of Directors shall have the right to require a member at any time to give ninety (90) days notice in writing of his or her shares.

**Section 4.** This Credit Union may accept any kind and type of shares or deposits permitted by law.

## ARTICLE IV
### Loans

**Section 1.** A member may not borrow from the Credit Union when not in good standing, nor if he/she has failed to repay any previous loans, nor if he/she is in arrears in the payment of any current loan or installment thereon.

**Section 2.** No loan shall be made except on written application which contains all of the information required by law and is signed by the person desiring the loan. All applications for loans shall be filed as permanent records of the corporation.

**Section 3.** A member failing to pay an installment on a

loan when due, unless excused therefrom for cause by the Board of Directors, shall pay all charges due not in excess of that authorized by law. If installments, interest or fines remain unpaid for any one month, the Board of Directors may take such steps toward terminating his/her membership and making collections as may its judgment be advisable.

## ARTICLE V
### Board of Directors

**Section 1.** The Board of Directors shall consist of fifteen (15) members, divided into three (3) groups, as nearly equal in number as possible. At the organization meeting, each group shall be elected for terms expiring at the three (3) next succeeding annual meetings held in accordance with Article X. Successors to the retiring group shall be elected at each annual meeting for a term of three (3) years.

**Section 2.** Any vacancy occurring between annual meetings may be filled by the Board of Directors. The Directors, at their discretion, may offer this vacancy to the next highest runner-up from the previous election. The Director will fill this position until the next annual meeting when a successor shall be chosen for the unexpired term.

**Section 3.** Regular meetings of the Board shall be held on the third Monday of each month provided that when said day falls upon a holiday the meeting shall be held on the next Monday. Other meetings may be called by the President or upon petition of three (3) members of the Board.

**Section 4.** The Board of Directors shall perform the following duties in addition to those enumerated in the statutes:

(a) Designate the bank or banks in which funds of the corporation shall be deposited;

(b) Authorize the investments other than loans to members;

(c) Appoint the person who with the Treasurer shall have joint control of the securities;

(d) Take all measures for the interest of the Credit Union not within the jurisdiction of the annual meeting and not inconsistent with the laws of the Commonwealth or these by-laws;

(e) Fix the rate of dividends, if any, paid on shares.

(f) Appoint a Chief Executive Officer and/or such other employee as they deem necessary to in-sure the efficient operation of the Credit Union.

**Section 5.** A quorum shall consist of not less a majority of the Directors. If less than a quorum is present, a majority of those present may adjourn the meeting until the next regular meeting or another time or times prior thereto.

**Section 6.** If a member of the Board of Directors fails to attend its regular meetings and to perform any of the duties involving him/her as a Director for three (3) consecutive meetings, his/her office may be declared vacant by the Board and the vacancy filled as herein provided.

**Section 7.** During the absence or disability of any officer, the Board of Directors may appoint another member to act temporarily in his/her stead.

**Section 8.** This Credit Union, by a majority vote of its Board of Directors, may indemnify its directors, officers, employees or other agents for any loss which any one of them may sustain by reason of any action, either by law or in equity, brought against him/her for any of his/her actions as a director, officer, employee or agent of the Credit Union. Such person may be indemnified as provided for in these by-laws even though he/she is no longer an officer,

director, employee or agent of the Credit Union. He/she shall not be so indemnifies if it is adjudicated in any proceeding that he/she did not act in good faith. He/she may be so indemnified if he/she acted in a reason-able belief that his/her action was in the best interest of the Credit Union.

Such indemnification may include payment by the Credit Union of expenses incurred in defending a civil or criminal action or proceeding and advance of the final disposition of such action or proceedings upon receipt of a written undertaking by the person indemnified to repay such payment if he/she is adjudicated to be not entitled to indemnification under this by-law. This Credit Union shall have the right upon a majority vote of its Board of Directors to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or any other agent of the Credit Union, against any liability incurred by him/her in any such capacity, or arising out of his/her status as such, whether or not the Credit Union would have the power to indemnify him/her against such liability. The intent of this by-law is to comply with the provisions of Chapter 80 of the Acts of 1973.

### ARTICLE VI
### Credit Committee

**Section 1.** The Credit Committee shall consist of up to five (5) but not less than three (3) members.

**Section 2.** Meetings shall be held on a regular basis and at least once per month as required by M.G.L. CH. 171.

**Section 3.** A quorum shall consist of not less than a majority of members.

**Section 4.** Other meetings may be called by the Chairperson or on petition of two (2) or more members thereof.

**Section 5.** The Credit Committee shall inquire carefully into the personal habits and financial condition of borrowers and their

sureties to ascertain their ability to repay fully and promptly the obligations assumed by them and whether the loan promises to be of benefit to the borrower

**Section 6.** The Credit Committee shall determine the security or guarantors which shall be required for each loan and the terms upon which it shall be repaid. Where the security is nearly equal, preference shall be given, in all cases, the smaller loan.

## ARTICLE VII
### Auditing Committee

**Section 1.** The Auditing Committee shall consist of not less than three (3) nor more than five (5) members.

**Section 2.** The Auditing Committee shall keep fully informed as to the financial condition of the Credit Union, by examination and audits as required by law. They shall examine all applications for loans made during the period under examination and satisfy themselves that for each loan made an application is on file and that each application states the purpose for which the loan is made, a description of the security offered and that it bears the approval of a loan officer. At least one (1) member of the committee shall attest the balance sheet which the Treasurer is required by the by-laws to prepare each month.

**Section 3.** The Auditing Committee shall meet regularly and at least once per month as required by M.G.L. CH. 171.

## ARTICLE VIII
### Officers and Their Duties

**Section 1.** The officers of this corporation shall be a Chairperson (who shall also serve as President), two (2) Vice Chairpersons, a Clerk, a Treasurer and an Assistant Treasurer who shall be elected at the first meeting of the Board of Directors), immediately following the annual meeting of the members. They shall choose their successors as herein provided. The office of the President and Treasurer may not be held by the same person (in conformity with General Laws Chapter 171, section 15).

The office of Chairperson, Treasurer and Clerk shall be limited to three (3) consecutive terms.

**Section 2.** It shall be the duty of the Chairperson to preside at meetings of the members and of the Board of Directors, to countersign all notes and drafts drawn by the corporation and to perform such other duties as pertain to the office.

**Section 3.** It shall be the duty of the Vice Chairperson to perform the duties of the President in the event of the absence or disability of that office in order of their election.

**Section 4.** It shall be the duty of the Clerk to keep a record of all meetings of the members and the Board of Directors. He/she shall give notice of all meetings of members in the manner prescribed by the by-laws and shall perform all other duties incident to his/her office.

**Section 5.** It shall be the duty of the Treasurer and/or Chief Executive Officer to serve as the active manager of the corporation under orders of the Board of Directors, to sign all checks, notes and drafts drawn by the corporation, to have the custody of the cash, securities, books of account and other valuable papers of the Credit Union, said books and accounts to be at all times open to the inspection of the Board of Directors, to prepare a balance sheet showing the condition of the Credit Union within seven (7) days after the close of each month, which statement shall be attested to by at least one (1) member of the Auditing Committee and shall be posted in a conspicuous place in the office of the Credit Union where it shall remain until replaced by the statement of the succeeding month. He/she shall within forty-eight (48) hours after receipt, deposit prescribed by the Board of Directors.

**Section 6.** It shall be the duty of the Assistant Treasurer to perform the duties of the Treasurer in the event of the absence or disability of that officer.

**Section 7.** Pursuant to the provisions of General Laws Chapter

171, section 15, the Board of Directors may delegate to one (1) or more loan officers, who need not be members of the Credit Committee, or to an employee, who need not be a member of the Board of Directors, the power to make all loans provided for in this chapter, with the exception of real estate loans. All loans made by such loan officer or employee shall be reported to the Credit Committee within seven (7) days from the date of the loan.

## ARTICLE IX
### Meetings of Members

**Section 1.** The Annual Meeting of the members shall be held in the greater Boston area, each year, on the first Monday in April or as voted by the Board of Directors.

**Section 2.** Notice of all meetings, special and annual, shall be given by the Clerk who shall at least forty-five (45) days before the date of such meetings post a notice of the meeting in a conspicuous place in the office of the Credit Union and on bulletin boards of the Authority.

**Section 3.** At annual or special meetings twenty-five (25) members shall constitute a quorum. If no quorum is present, an adjournment shall be taken to a date not less than seven (7) days thereafter and the decisions of the adjourned meeting shall be binding regardless of the number of members present. Notice of adjourned meetings shall be given by the Clerk as required by Section 2 not less than five (5) days previous to the date of the meeting.

**Section 4.** The members at their annual meeting shall fix subject to the provisions of existing statutes:

   (a) The maximum amount of credit which may be extended to any one (1) member, either as borrower or endorser or both;

   (b) The portion of profits to be set apart as reserves.

**Section 5.** All elections shall be held by ballot, voting machine, or in such other manner and in such place or places as determined by the Board of Directors and comply with applicable law.

**Section 6.** All names of members for nomination as directors must be supported by at least fifty (50) signatures of members and must be submitted to the Election Committee not later than thirty (30) days before the annual election. There shall not be nominations from the floor.

**Section 7.** Any member who desires to become a candidate for the Credit Union Board of Directors shall submit his/her nomination on a form prepared by the Election Committee. The nomination form must be signed by at least fifty (50) members in good standing of the Credit Union. Eligibility of all candidates for nomination and election shall be determined in confidence by the Election Committee. The following eligibility criteria shall apply to each candidate as of the dates of nomination and election:

1. Each candidate must be a member in good standing of the Credit Union;
2. A candidate may not have a Credit Union loan more than sixty (60) days delinquent not more than two (2) overdrafts on a Credit Union account during the twelve (12) months preceding nomination (overdraft protected accounts excluded) unless approved by the Election Committee;
3. All Credit Union loans and accounts of a candidate must be current at the time of nomination and election
4. A candidate may not have declared bankruptcy within the previous five (5) years;
5. A candidate shall certify, under the pains and penalties of perjury, that he/she:
(a) is not delinquent in filing or paying federal and state income taxes;
(b) does not have private business dealings with the Credit Union other than accounts and loans;

(c) does not have outstanding unsatisfied civil judgments (other than continuing obligations such as alimony and child support with which the candidate shall certify he/ she is in compliance) and is not the subject of a pending indictment of conviction of a crime involving dishonesty or breach of trust.

## ARTICLE X
### Reserve Funds

**Section 1.** *Loan Reserve:* A credit union shall maintain a reserve for losses on loans, which reserve shall equal and be maintained at an amount equal to the average losses sustained on such loans over the previous five (5) most recent years as classified in the commissioner's reports of the last five (5) examinations; provided, however, that if a credit union has not been in existence for five (5) years, the average losses sustained on said loans shall be the average of those losses as classified in the commissioner's reports of its examinations.  Should the reserves maintained in this section exceed the amount necessary to be kept or maintained in those accounts, the credit union may transfer such excess into undivided earnings account. However, in all cases this section will comply with general accepted accounting procedures as per M.G.L. Chapter 171 section 69.

**Section 2.** *Investment Reserve:* A credit union shall maintain a reserve for losses on investments equal to five (5) percent of the difference between the book value and the market value of all investments excluding those investments which are included in the liquidity reserve. Should the reserves exceed the amount necessary to be kept or maintained in those accounts, the credit union may transfer such excess into an undivided earnings account.

## ARTICLE XI
### Investment Committee

**Section 1.** The Investment Committee shall consist of three (3) members:
 a) They shall meet once a month;
 b) A quorum shall consist of at least two (2) members;

(c) The Investment Committee shall oversee the proper investments of the Credit Union within the limits of the statutes.      .

## ARTICLE XII
### Amendment of By-Laws

**Section 1.** These by-laws may be amended by the members at an annual or special meeting, by a three-fourths vote of those present and entitled to vote, provided that copy of the proposed amendment and a notice of the meeting shall have been posted and maintained for at least seven (7) days before the date of such meeting in the office of the Credit Union and on the bulletin boards throughout the system.

**Section 2.** The amendment has been reviewed by counsel for the Credit Union and approved with an opinion that such proposed amendment would be legal; and

**Section 3.** A copy of the proposed amendment and a notice of the meeting shall have been posted and maintained for at least seven (7) days before the date of such meeting in the office of the Credit Union and on the bulletin boards throughout the system; and

**Section 4.** No amendment proposing a change in the condition of residence, occupation or association which qualify persons for membership, or change in location, or change in name shall become operative until it has been approved in writing by the Commissioner of Banks.

## ARTICLE XIII
### Election Committee

**Section 1.** The Election Committee shall consist of five (5) members. A quorum shall consist of three (3) members.

**Section 2.** The Election Committee shall prepare nomination forms for candidates for election to the Board of Directors and review the eligibility of all candidates for nomination and election.

# EXHIBIT 19

4.4✓

# Commonwealth of Massachusetts
## Superior Court

SS, Suffolk                                          DOCKET NO. 05-1289 A

4.4.05
notice in
Hann
R.L

Richard Livingston        )
        Plaintiff, Pro Se   )        COMPLAINT
                            )        ~~REQUEST for PRELIMINARY~~
    vs.                     )        ~~INJUNCTION~~
                            )        MRCP RULE 65(a)
Massachusetts Bay Transportation )
Authority Employees Credit Union )
aka/ MBTA Employees Credit Union )
Board of Directors / Election Committee )
Et al            Defendants  )

Pursuant to Massachusetts Rules of Civil Procedure, Rule 65(a) Injunctions, I

Richard Livingston, Plaintiff, Pro Se, ask this honorable court to allow immediate

Temporary Restraining Order without notice requiring Massachusetts Bay Transportation

Authority Employees Credit Union aka / MBTA Employees Credit Union, et al, to refrain

from conducting the annual election of the Board of Directors on April 4th, 2005.

For the following reasons:

1.) If the election is not stopped immediately irreparable damage will result to the Plaintiff, Pro Se, Richard Livingston.

2.) Richard Livingston, Plaintiff, Pro Se, received from The MBTA Employees Credit Union Board of Directors and the Election Committee et al a written communiqué dated March 11, 2005 received on March 16, 2005 noting "that your eligibility does not comply with our By-Laws (Article IX, Section 7) as you have a bankruptcy which occurred in the five years previous to your candidacy request." Plaintiff Pro Se Richard Livingston was out of the country and responded immediately upon his return.

3.) The Election Committee / Board of Directors MBTA Employees Credit Union et al, then stated the ballot was April 5th, 2005 when in fact it is TODAY.

4.) The Plaintiff Pro Se Richard Livingston filed for Bankruptcy Protection January 2000 / 2001 some four and a half (4 ½) years ago is being barred from running for the MBTA Employees Credit Union Board of Directors due to the aforementioned By-law which violates the US Bankruptcy Code, Title 11, Chapter 5, Subsection II, s 525(a). Protection Against Discriminatory Treatment.

5.) MBTA Employees Credit Union Board of Directors and Nomination Committee have set in place a by-law that violates federally protected statutory rights not to be discriminated against.

Plaintiff, Pro Se, Richard Livingston ask this honorable court to stop the election because supporting documents clearly present facts which support the Plaintiff, Richard Livingston's, filing of Bankruptcy along with verified documents stating his position and the irreparable loss and harm that will be caused to him if this election goes forward.

Plaintiff, Pro Se, Richard Livingston, pleads with this honorable court to stop the election TODAY in order that the plaintiff pro se might present to the MBTA Employees Credit Union Board of Directors and the Election Committee, et al, his argument to existing by-laws with hope of amending discriminatory by-laws and ending discriminatory practice.

Richard Livingston, Pro Se
April 4, 2005

4/4/05

Attached Documents:
A.) MBTA Employees Credit Union Board of Directors and the Election Committee, et al letter dated March 11, 2005
B.) Plaintiff, Pro Se, Richard Livingston Letters to resolve issue dated March 17-18-23, 2005
C.) US Bankruptcy Code Title 11, Chapter 5, Subsection II, s 525(a)

CERTIFICATE OF SERVICE

Plaintiff, Pro Se, Richard Livingston, states and swear that I have this April 4th, 2005

notified the Defendants Massachusetts Bay Transportation Authority Employees Credit

Union aka / MBTA Employees Credit Union Board of Directors, and the Election

Committee et al, by first class mail at 147 West Fourth Street, South Boston, MA. 02127,

and by serving in hand a copy of the above Request for Preliminary Injunction.

Richard Livingston, Pro Se
April 4, 2005

I HEREBY ATTEST AND CERTIFY ON
_____ 6, 2006 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

By

SUPERIOR COURT DEPT

SUFFOLK, ss
(date)
Notice ordered issued hereon returnable
at the
on
to show cause why
should not
By the Court,
ATTEST:
Assistant Clerk

**Officers**
William A. Irvin
*President &*
*Chairman of the Board*

Francis Joyce
*Vice Chairperson*

Ronald I. Sullivan
*Treasurer*

James P. Griffin
*Assistant Treasurer*

Michael J. Hogan
*Clerk*

# MBTA Employees Credit Union
## 147 West Fourth Street
## South Boston, MA 02127

*branch offices:*

Medford, MA 02155

Quincy, MA 02169

*connecting all offices:*

**617-269-2700**

www.mbtaecu.org

*Directors:*

John J. Coakley
Pauline Davis
Todd Downey
Kevin J. Doyle
Matthew J. Duggan
James P. Griffin
Michael J. Hogan
Edward M. Irvin
William A. Irvin
Francis Joyce
Melvin Keith
Terry Reed
Noreen M. Ryan
Ilse A. Sullivan
Ronald I. Sullivan

March 11, 2004

Mr. Richard Livingston
149 Warren Avenue
Milton  MA  02186

Dear Mr. Livingston:

We are in receipt of your nomination papers to become a candidate for election to our Board of Directors. Please be advised that your eligibility does not comply with our By-Laws (Article IX, Section 7) as you have a bankruptcy which occurred in the five years previous to your candidacy request.   Therefore, your name will not appear on the ballot on April 5, 2005.

Very truly yours,

***Election Committee***
***Board of Directors***
***MBTA Employees Credit Union***

*Over one hundred and seventy-five million in assets.*





**MBTA Employees Credit Union**
147 West Fourth Street
South Boston, MA 02127






Mr. Richard Livingston

149 Warren Avenue

Milton  MA  02186

149 Warren Avenue
Milton, MA. 02186-2009
March 17, 2005

Election Committee & Board of Directors
M.B.T.A. Credit Union
147 West Fourth Street
South Boston, MA. 02127

To Whom It May Concern

I am in receipt of your letter dated March 11, 2005 of which I collected on the sixteenth as I had been out of the country. I write this missive to ask that you reconsider your decision that has removed my name from the ballot. I believe it to violate Federal Law, which could subject the credit union and it's membership to a costly litigation.

The M.B.T.A. Credit Union By-Law (Article IX, Section 7) whether using a narrow or expansive window of interpretation has taken an adverse action in which my bankruptcy filing "appears to have played a significant role." The Election Committee stated, "… as you have a bankruptcy which occurred in the five years previous to your candidacy request." I would like to request a copy of the date, time, hour and participants who voted on this course of action without giving me the due process and equal protection of a hearing on the matter. Some courts have chosen to focus on Bankruptcy Code's policy "of aiding the rehabilitation of the debtors and providing a fresh start".

These courts interpret the language of section 525(a) broadly to prohibit discrimination that impedes the "fresh start" policy of the bankruptcy code. As a member of the MBTA credit Union in continuously good standing for over twenty years and never default or delinquent on any and all credit / debit accounts why this course of action?

I anxiously await your quick action and response to my questions and a vote of reconsideration; your attention to the urgency of the matter is appreciated. Any questions please feel free to contact me at 617-222-5420 or by mail to the aforementioned address.

Respectfully Requested
*Richard Livingston*
Richard Livingston

B-1

149 Warren Avenue
Milton, MA. 02186-2009
March 18, 2005

Election Committee & Board of Directors
M.B.T.A. Credit Union
147 West Fourth Street
South Boston, MA. 02127          RE: <u>Follow up to Letter Dated 3-17-05</u>

To Whom It May Concern:

 I write this note as a friendly follow-up to my missive of yesterday asking your reconsider of the decision to removed my name from the ballot. As I stated I believe it to violate Federal Law, and have attached for you edification some support documentation. My efforts are to work together in an effort to come to a mutual understanding and avoid having to file a motion in court.

 The M.B.T.A. Credit Union By-Law (Article IX, Section 7) has the potential to sully my reputation due to present gossip I have heard. I am waiting on my request of a copy of the date, time, hour and participants who voted on this course of action without giving me the due process and equal protection of a hearing on the matter. The focus on Bankruptcy Code's policy "of aiding the rehabilitation of the debtors and providing a fresh start", is a work in progress especially the evolution of the Perez Rule. "...or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union."

 The court interprets the language of section 525(a) broadly to prohibit discrimination that impedes the "fresh start" policy of the bankruptcy code. "The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination." As a member of the MBTA credit Union in continuously good standing for over twenty years why this course of action?

 I anxiously await your reconsideration of this urgent matter. Any questions please feel free to contact me at 617-222-5420 or by mail to the aforementioned address.

Respectfully Requested
*Richard Livingston*
Richard Livingston                    Attachments: US Code Collection

B-2

# URGENT - INTAKE

## Election 4-5-05

*Debtor Nondiscrimination Civil Rights Violation*

It was brought to my attention when I file more than the required nomination signatures to qualify for the Annual M.B.T.A. Employees Credit Union Board of Directors Election that I would have to sign a Credit Review Release Form. I have just been informed (see attached letter) that the MBTA Credit Union has a by-law that disqualifies employees who have file for Bankruptcy Protection in the past five years. When this by-law was enacted is not clear, as the posting for the board elections have never included the rules and regulation or the disqualifiers. Enforcement of this by-law has allowed the MBTA Credit Union Board of Directors (State Chartered Credit Union) to take an adverse administrative action against members in good standing who demonstrate financial responsibility but due to circumstance beyond their control filed for Bankruptcy Protection.

While common sense might lead to the conclusion that filing bankruptcy would be conclusive proof of irresponsibility, that conclusion, while logical, it would on its face appear illegal. Specifically, the non-discrimination provisions of Section 525(a) of the Bankruptcy Code, 11 U.S.C.A. Section 525(a)(West Supp. 1996) protect debtors against governmental (state chartered) action taken on the basis of filing bankruptcy. The termination of my candidacy for the board violated the statutory prohibitions of discrimination against those filing for bankruptcy. Some courts have chosen to focus on Bankruptcy Code's policy "of aiding the rehabilitation of the debtors and providing a fresh start". These courts interpret the language of section 525(a) broadly to prohibit discrimination by governmental units that impedes the "fresh start" policy of the bankruptcy code. The M.B.T.A. Credit Union By-Law (Article IX, Section 7) whether using a narrow or expansive window of interpretation has taken an adverse action in which my bankruptcy filing "appears to have played a significant role." The Election Committee stated, "... as you have a bankruptcy which occurred in the five years previous to your candidacy request."

The law states that "except as provided . . . a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter,

franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title . . . solely because such bankrupt or debtor is or has been a debtor under this title . . ., has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act."

These protections prohibit discrimination on any of three enumerated bases:

(1) the filing of bankruptcy;
(2) the debtor's insolvency before or during bankruptcy; or
(3) nonpayment of a debt that was discharged in bankruptcy.

A careful review of the facts surrounding my personal bankruptcy would show that the MBTA Credit Union received all payments before during and after my discharge from bankruptcy. It would be understanding if the MBTA Credit Union was taking this action against a candidate so long as the action is actually based on irresponsibility, and is not a knee-jerk reaction to the bankruptcy filing. I find this to be violation of Due Process and Equal Protection Clause of the U.S. Constitution because U.S. Bankruptcy is a protected right not an indictment or crime. This by-law allows the Credit Union Board of Directors to take action not based on the facts and circumstances that individual and personal issues that surrounded the bankruptcy filing, but solely on the basis of the filing itself.

This is an important protection, because many creditors try to browbeat individuals into paying their debts by telling them that filing bankruptcy will be hung over their heads for years. If the individual is truly an "honest but unfortunate debtor," it violates the tenants of various laws, constitutional, bankruptcy, discrimination, due process, equal protection, privacy rights and no entity should have justification for taking negative and adverse action that leaves the debtor looking like they committed a crime.

"In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez rule. This section permits further development to prohibit actions by

governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union." (see Attached US CODE COLLECTION)

Respectfully request your assistance. Sincerely

Richard Livingston, 149 Warren Avenue, Milton, MA 02186-2009

617-222-5420 work        617-698-4333 home

149 Warren Avenue
Milton, MA. 02186-2009
March 23, 2005

Election Committee & Board of Directors
M.B.T.A. Credit Union
147 West Fourth Street
South Boston, MA. 02127          **RE: Letter's Dated 3/17/05 & 3/18/05**

To Whom It May Concern:

      As of today one week has passed since I sent my first letter to the Election Committee & Board of Directors about my request and concerns over being taken off the ballot due to "M.B.T.A. Credit Union By-Law (Article IX, Section 7)". In light of the fact that the election is schedule for April 5, 2005 the nature of the matter is time sensitive and should not be dismissed slight of hand. If I do not have a response to the questions addressed in my two prior communiqués by Friday March 25, 2005. I will take that as a sign that you have no intention of answering. In the event that is the case I will pursue the matter in a different venue.

      Knowing the urgency of the matter and the time sensitive nature of the issue it is perplexing to me that I have not heard from the Board by now.

Respectfully Requested
*Richard Livingston*
Richard Livingston

B-3



# LII
legal information institute

## US CODE COLLECTION

collection home                    search                    donate

**TITLE 11 > CHAPTER 5 > SUBCHAPTER II > § 525**

**NOTES:**

**Source**

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2593; Pub. L. 98–353, title III, § 309, July 10, 1984, 98 Stat. 354; Pub. L. 103–394, title III, § 313, title V, § 501(d)(15), Oct. 22, 1994, 108 Stat. 4140, 4145.)

**Historical and Revision Notes**

**senate report no. 95–989**

This section is additional debtor protection. It codifies the result of Perez v. Campbell, 402 U.S. 637 (1971), which held that a State would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy.

Notwithstanding any other laws, section 525 prohibits a governmental unit from denying, revoking, suspending, or refusing to renew a license, permit, charter, franchise, or other similar grant to, from conditioning such a grant to, from discrimination with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor or that is or has been associated with a debtor. The prohibition extends only to discrimination or other action based solely on the basis of the bankruptcy, on the basis of insolvency before or during bankruptcy prior to a determination of discharge, or on the basis of nonpayment of a debt discharged in the bankruptcy case (the Perez situation). It does not prohibit consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as net capital rules, if applied nondiscriminatorily.

In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.

The effect of the section, and of further interpretations of the Perez rule, is to strengthen the anti-reaffirmation policy found in section 524 (b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

The section is not so broad as a comparable section proposed by the Bankruptcy Commission, S. 236, 94th Cong., 1st Sess. § 4–508 (1975), which would have extended the prohibition to



any discrimination, even by private parties. Nevertheless, it is not limiting either, as noted. The courts will continue to mark the contours of the anti-discrimination provision in pursuit of sound bankruptcy policy.

## References in Text

The Perishable Agricultural Commodities Act, 1930, referred to in subsec. (a), is act June 10, 1930, ch. 436, 46 Stat. 531, as amended, which is classified generally to chapter 20A (§ 499a et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 499a (a) of Title 7 and Tables.

The Packers and Stockyards Act, 1921, referred to in subsec. (a), is act Aug. 15, 1921, ch. 64, 42 Stat. 159, as amended, which is classified generally to chapter 9 (§ 181 et seq.) of Title 7. For complete classification of this Act to the Code, see section 181 of Title 7 and Tables.

Section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943, referred to in subsec. (a), is classified to section 204 of Title 7.

The Bankruptcy Act, referred to in text, is act July 1, 1898, ch. 541, 30 Stat. 544, as amended, which was classified generally to former Title 11.

The Higher Education Act of 1965, referred to in subsec. (c)(2), is Pub. L. 89–329, Nov. 8, 1965, 79 Stat. 1219, as amended. Parts B, D, and E of title IV of the Act are classified generally to parts B (§ 1071 et seq.), C (§ 1087a et seq.), and D (§ 1087aa et seq.), respectively, of subchapter IV of chapter 28 of Title 20, Education. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of Title 20 and Tables.

## Amendments

1994—Subsec. (a). Pub. L. 103–394, § 501(d)(15), struck out "(7 U.S.C. 499a–499s)" after "Act, 1930", "(7 U.S.C. 181–229)" after "Act, 1921", and "(57 Stat. 422; 7 U.S.C. 204)" after "July 12, 1943".

Subsec. (c). Pub. L. 103–394, § 313, added subsec. (c).

1984—Pub. L. 98–353 designated existing provisions as subsec. (a), inserted "the" before "Perishable", and added subsec. (b).

## Effective Date of 1994 Amendment

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

## Effective Date of 1984 Amendment

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

## Section Referred to in Other Sections

This section is referred to in section 106 of this title.

**credits**                                    **about us**                                    **send email**

**EXHIBIT 20**

**Commonwealth of Massachusetts**
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

## SUCV2005-01289
## Livingston v MBTA Employees Credit Union aka

| File Date | 04/04/2005 | Status | Dismissed (dism) | | |
|---|---|---|---|---|---|
| Status Date | 04/20/2005 | Session | A - Civil A, 3 Pemberton Sq, Boston | | |
| Origin | 1 | Case Type | E99 - Miscellaneous | | |
| Lead Case | | Track | X | | |

| Service | 07/03/2005 | Answer | 09/01/2005 | Rule12/19/20 | |
|---|---|---|---|---|---|
| Rule 15 | | Discovery | | Rule 56 | |
| Final PTC | 10/01/2005 | Disposition | 10/31/2005 | Jury Trial | No |

### PARTIES

**Plaintiff**
Richard Livingston
149 Warren Ave
Milton, MA 02186
Active 04/04/2005 Notify

**Defendant**
MBTA Employees Credit Union aka
Service pending 04/04/2005

**Alias defendant name**
MBTA Employees Credit Union Board of Directors
& Election Commit
Active 04/04/2005

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 04/04/2005 | 1.0 | Complaint |
| 04/04/2005 | | Origin 1, Type E99, Track X. |
| 04/04/2005 | 2.0 | Civil action cover sheet filed |
| 04/04/2005 | | After review of thie papers, plffs ex parte, unverified request for injunc relief, filed over two weeks after plff was advised of defts position, is DENIED (Troy,J) |
| 04/20/2005 | 3.0 | JUDGMENT OF DISMISSAL (FAILURE TO PROSECUTE) The complaint of plff is Dismissed for lack of prosecution without prejudice entered on docket pursuant to Mass R Civ P 58(a) and notice sent to parties pursuant to Mass R Civ P 77(d)   Troy J |

### EVENTS

case01 246970 y y y y y y                                                                               Page 1 of 2

**Commonwealth of Massachusetts**
**SUFFOLK SUPERIOR COURT**
**Case Summary**
**Civil Docket**

## SUCV2005-01289
### Livingston v MBTA Employees Credit Union aka

| Date | Session | Event | Result |
|------|---------|-------|--------|
| 04/13/2005 | Civil A, 3 Pemberton Sq, Boston | Motion/Hearing: order of notice | Plaintiff did not appear |

I HEREBY ATTEST AND CERTIFY ON

_____ 2006 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____

**EXHIBIT 21**



# The Commonwealth of Massachusetts

### Office of the Commissioner of Banks
### One South Station
### Boston, Massachusetts 02110

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**STEVEN L. ANTONAKES**
COMMISSIONER OF BANKS

JANICE S. TATARKA
DIRECTOR
OFFICE OF CONSUMER AFFAIRS AND
BUSINESS REGULATION

July 12, 2006

To Whom It May Concern:

This letter is to certify that records currently in the possession of the Division of Banks indicate that MBTA Employees Credit Union, South Boston, Massachusetts was incorporated on February 11, 1936. MBTA Employees Credit Union continues to operate as a state-chartered credit union under Massachusetts General Laws chapter 171 and other related statutes and remains subject to examination and regulation of the Commissioner of Banks.

Sincerely,

Neil T. Tobin
Counsel



**EXHIBIT 22**

days before each payment which it will be made until Aurora Jun 30, 28 he. However, you may choose instead to get this notice only when the payment would differ by more than a stated amount from the previous payment, or when the amount would fall outside certain limits that you have set.

**(c) Liability for failure to stop payment of preauthorized transfer.** If you order us to stop one of these scheduled EFT payments 3 business days or more before the transfer is scheduled, and we do not do so, we will he liable for your actual losses.

## 5. LIABILITY FOR UNAUTHORIZED TRANSFERS.
Tell us AT ONCE if you think your card, your PIN or both, have been lost, stolen or used without your permission. Telephoning is the best way of minimizing your possible losses. You could lose all the money in your account plus your overdraft line of credit. You can lose no more than $50.00 if you notify us in a timely manner that someone used your card without your permission. If you fail to give us timely notice of your lost or stolen card or PIN, that amount may increase if the credit union can prove the loss could have been avoided had you notified us.

## 6. YOUR RIGHT TO RECEIVE TRANSFER DOCUMENTATION
**(a) Terminal transfers.** You can get a receipt at the time you make any transfer to or from your account when you use a 24-Hour banking machine or Point of Sale terminal.

**(b) Preauthorized credits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company. and you DO NOT receive verification each time a deposit is made from that party, you may call us at the appropriate telephone number printed on the front cover of this Agreement during the business hours indicated to find out whether a deposit has been made. You may call us to verify a preauthorized credit as described above.

**(c) Periodic statements.** You will be sent monthly account statements.

**(d) Preauthorized Transfers.** If a preauthorized transfer is not made because your account has insufficient funds to honor the transfer, we will mail or deliver to you, on or before the next business day, notice of our refusal to pay the transfer.

## 7. EVIDENCE.
Any documentation provided to you, which indicates that an EFT was made, shall be admissible as evidence of such transfer and shall constitute prima-facie proof that such transfer was made in accordance with the information contained therein.

## 8. CONFIDENTIALITY
In order that your privacy may be protected, we will not disclose any information about you or your account to any person or organization, or agency except:
- for certain routine disclosures necessary for the completion of a transfer; or
- for verification of the condition and existence of our account for credit bureau or merchant; or
- to persons authorized by law in the course of their official duties: or
- to our auditors, service providers, affiliates, attorneys, or collection agents in the course of their duties; or
- pursuant to a court order or lawful subpoena; or
- to a consumer reporting agency as defined in Massachusetts General Laws, or
- by your written authorization which shall automatically expire 45 days after our receipt of your authorization.

If an unauthorized disclosure has been made, we must inform you of the particulars of the disclosure within 3 days after we have discovered and verified that an unauthorized disclosure has occurred.



**MBTA**
**Employees Credit Union**

Terms and Conditions of
Electronic Funds Transfer

**MAIN BRANCH**
147 West Fourth Street
South Boston, MA 02127

Connecting all Offices
Phone: (617) 269-2700
FAX: (617) 269-2720

**BRANCH OFFICES**
Quincy Center MBTA
Quincy, MA 02169
Wellington MBTA Station
Medford, MA 02155
OUTSIDE (617): 800 - MBTAECU
visit us on the web at: www.mbtaecu.org

# EXHIBIT 23

# REBA Title Standard No. 21
## Scriveners' Errors

A title is not defective by reason of:

(1) The omission or addition of a middle or first initial or name of an individual or minor variation in the spelling of names;

(2) The change of the name of a person as a result of marriage, or judicial change of name (in the latter case, reference should be made to the court and date of judgment);

(3) Minor variations from the correct name of a corporation, trust, limited partnership, limited liability company, limited liability partnership or other legal entity, such as the omission or addition of "The" or the interchange of the long form entity name with the abbreviated form;

(4) Inconsistencies in, or lack of dates of, execution and acknowledgement;

(5) Minor errors in area or in distances of bounds or the omission of one bound or incorrect compass points in a description, especially if the correct lot number and plan reference or reference to title are included in the description;

or

(6) The omission of, or an erroneous reference to, either the date or the record reference (but not both) to a mortgage in the case of an assignment, partial release, or discharge of such mortgage.

### Comment

See _Gillespie v. Rogers_, 46 Mass. 610, 16 N.E. 711, and _Lancy v. Snow_, 180 Mass. 411, 62 N.E. 735, as to omissions, additions and variations in names of individuals; _Harrison v. Phillips Academy_, 12 Mass. 456, _Ashkenazy v. R..M. Bradley & Co._, 328 Mass. 242, 103 N.E.2d 251, and _Dresel v. Jordan_, 104 Mass. 407, as to inconsistencies in or lack of dates; and _Worthington v. Hyler_, 4 Mass. 196, as to minor errors and omissions in descriptions.

Adopted May 3, 1977
Amended May 3, 1993 (Added Clause (6))
Amended May 11, 1998 (Changes to clause (3))

_I, Susan A. Graham, Chief Operating Officer for The Real Estate Bar Association for Massachusetts, Inc. hereby certify that this Title Standard 21 is the most up to date version of REBA's Title Standard #21 as of today's date._

Susan A. Graham, Chief Operating Officer,
July 5, 2006

REBA Title Standard No. 21